UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

--------------------------------------------------------- X
                                                          :
UNITED STATES OF AMERICA, the States      :
of CALIFORNIA, COLORADO,                  :
CONNECTICUT, DELAWARE, FLORIDA,           :
GEORGIA, HAWAII, ILLINOIS, INDIANA,       :   Civil Action No. _____
LOUISIANA, MICHIGAN, MINNESOTA,           :
NEVADA, NEW JERSEY, NEW MEXICO,           :
NORTH CAROLINA, OKLAHOMA,                 :   **Filed Under Seal**
TENNESSEE, TEXAS, AND                     :   **Pursuant to**
WASHINGTON, and the Commonwealths of      :   **31 U.S.C. § 3730**
MASSACHUSETTS and VIRGINIA, *ex rel.,*    :
JANE DOE, JANE ROE, JOHN DOE, and         :
ABC, LLC,                                 :
                                          :
                    Plaintiffs,           :
                                          :
        V.                                :
                                          :
UNIVERSAL HEALTH SERVICES, INC.,          :
THE BEHAVIORAL HOSPITAL OF                :
BELLAIRE, CYPRESS CREEK HOSPITAL,         :
KINGWOOD PINES HOSPITAL, WEST             :
OAKS HOSPITAL, and JOHN NEKIC,            :
                                          :
                    Defendants.           :
                                          :
--------------------------------------------------------- X

## COMPLAINT OF THE UNITED STATES

The United States of America, and the States of California, Colorado, Connecticut,

Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Louisiana, Michigan, Minnesota, Nevada,

New Jersey, New Mexico, North Carolina, Oklahoma, Tennessee, Texas, and Washington, and

the Commonwealths of Massachusetts and Virginia (the "Plaintiff States"), by and through their

*qui tam* Relators, Jane Doe, Jane Roe, John Doe, and ABC, LLC (the "Relators") bring this

action under the Federal False Claims Act, 31 U.S.C. § 3729-3733, *et seq.* (the "False Claims

Act"), the False Claims Acts of the respective Plaintiff States, the Federal Anti-Kickback Statute,

42 U.S.C. § 1320a *et seq*. (the "Anti-Kickback Statute"), and the Social Security Act, 42 U.S.C. 1395a (the "Social Security Act") against Universal Health Services, Inc. ("UHS" or "Universal") and four Houston-area mental health hospitals that UHS acquired in 2012: The Behavioral Hospital of Bellaire ("Bellaire"), Cypress Creek Hospital ("Cypress"), Kingwood Pines Hospital ("Kingwood"), and West Oaks Hospital ("West Oaks"), and Bellaire's former Chief Executive Officer ("CEO") John Nekic ("Nekic") (collectively, "Defendants") to recover all damages, penalties, and other remedies provided by each of the above-acts on behalf of the United States, the Plaintiff States, and the Relators, and for their complaint allege:

1.      Based on the Relators' personal knowledge and further investigation, and research including interviews with current and former employees and patients, from 2009 through the present, sufficient evidence, including statements by five confidential witnesses and three individual relators (defined herein), exists to allege that Defendants have violated and continue to violate the: (a) False Claims Act, 31 U.S.C. § 3729 (and state equivalents), by submitting bills to Medicare for mental health related services that were unnecessary, not provided and/or not eligible for payment due to non-compliance with the relevant, codified treatment and/or billing requirements; (b) Anti-Kickback Statute, 42 U.S.C. § 1320a et seq., by providing kickbacks to physicians in exchange for the physicians facilitating the admissions, and artificially prolonging the stays, of patients to Defendants' facilities; and (c) Social Security Act, 42 U.S.C. 1395a, by unlawfully "steering" patients to Defendant-owned facilities.

## PARTIES

2.      John Doe is a Houston-area resident who has been employed locally in the retail pharmaceutical industry for the last three years. In conjunction with his employment, he has worked closely with, and called upon, many of the facilities described herein on a regular basis

since 2010 and/or has otherwise formed relationships with certain of the partial hospitalization program ("PHP") patients discussed below.  Through the foregoing, he soon came to learn that Defendants, and certain psychiatrists whom work with them, were and are engaged in a continuous cycle of fraudulent conduct aimed at maximizing the financial return from these mental health patients by employing unscrupulous psychiatrists to admit patients into the Defendant Facilities who are not otherwise qualified for admission and, once admitted, to maximize the patient's length of stay regardless of medical need.  In exchange, the doctors are rewarded with paid medical directorships at the Defendant Facilities.  In addition, these doctors are further rewarded because the patient is then "steered" to that doctor for treatments.  These doctors then engage in systematic phantom visits and false billing with these patients.  After learning and uncovering this fraud he then "partnered" with Jane Doe and Jane Roe, who worked at Bellaire during the period described herein to further uncover the fraud.  John Doe has personal knowledge of the information attributed to him below.

3.     Jane Doe worked in Bellaire's inpatient facility's billing department from approximately October 2010-November 2012.  Jane Doe has personal knowledge of the information attributed to her below.

4.     Jane Roe worked at Bellaire's inpatient facility from approximately March 2010-July 2011 as a health technician and from approximately July 2011-March 2013 as a discharge planner.  Jane Roe has personal knowledge of the information attributed to her below.

5.     ABC, LLC is a Delaware corporation whose main address is 475 White Horse Pike, Collingswood, NJ, and which was formed for the purpose of bringing this action.

6.     Plaintiff United States of America, acting through the Department of Health and Human Services ("HHS"), and its Centers for Medicare and Medicaid Services ("CMS"),

administers the Health Insurance Program for the Aged and Disabled established by Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, *et seq.* ("Medicare"), and Grants to States for Medical Assistance Programs pursuant to Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 *et seq.* ("Medicaid").

7.      The Plaintiff States are the States of California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Louisiana, Michigan, Minnesota, Nevada, New Jersey, New Mexico, North Carolina, Oklahoma, Tennessee, Texas, and Washington, and the Commonwealths of Massachusetts and Virginia.  They each bring claims for UHS's violations of their respective state False Claims Acts, as set forth in detail below.

8.      Defendant UHS is a *Fortune 500*-listed hospital management company with annual revenues exceeding $7.5 billion and a net income of $398.2 million in 2011 and $443.5 million in 2012.  At March 31, 2013, UHS owned and/or operated 23 acute care hospitals 23 acute care hospitals and 197 behavioral health centers across the country.  In October 2012, UHS acquired New York-based Ascend Health Corporation and, with it, Bellaire, Cypress, Kingwood and West Oaks.

9.      Defendant Bellaire is comprised of a 70 bed inpatient facility located at 5314 Dashwood Drive, Houston TX ("Bellaire IP")  and two outpatient facilities: Tomball Outpatient Services, 28437 Tomball Parkway, Tomball, TX (daily patient census approximately 25-30) ("Tomball") and Aldine Outpatient Services, 2814 Aldine Bender, Houston, TX (daily patient census approximately 35-40) ("Aldine").  Until 2011, Bellaire operated a third outpatient facility, Mapleridge Outpatient Services, 5314 Dashwood Drive, Ste 200, Houston, TX (daily patient census approximately 25-30) ("Mapleridge").

10.      Defendant Cypress is comprised of a 96-bed inpatient facility and an outpatient

facility with an approximate daily patient census of 30, both of which are located at 17750 Cali Drive, Houston, TX.

11.     Defendant Kingwood is comprised of a 116-bed inpatient facility and an outpatient facility with an approximate daily patient census of 35, both of which are located at 2001 Ladbrook Dr., Kingwood, TX.

12.     Defendant West Oaks is comprised of a 144-bed inpatient facility at 6500 Hornwood, Houston, TX and three outpatient facilities with an approximate combined daily patient census of 85: West Oaks Hornwood Clinic, 6612 Hornwood Drive, Suite E, Houston, TX; The Excel Center of Katy, 503 Park Grove, Katy, TX; and The Excel Center of Friendswood, 111 E. Edgewood Drive, Friendswood, TX.[1]

13.     Defendant Nekic served as Bellaire's Chief Executive Officer from early 2011 until May 2013.  Upon information and belief, defendant Nekic is a resident of Texas.

## JURISDICTION AND VENUE

14.     Jurisdiction in this Court is proper pursuant to 31 U.S.C. §§ 3732(a) and 3730(b). This Court also has jurisdiction pursuant to 28 U.S.C. § 1331.

15.     The Court may exercise personal jurisdiction over the Defendants, and venue is proper in this Court pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391 because the acts proscribed by 31 U.S.C. §§ 3729 *et seq*., and complained of herein took place in part in this District and the Defendants transacted business in this District as described herein.

16.     Pursuant to 31 U.S.C. § 3730(b)(2), Relators prepared and served or will serve the Complaint on the Attorney General of the United States, and the United States Attorney for the

---

[1] Each of the medical facilities described in the foregoing paragraphs are referred to herein as the "Defendant Facilities."

Eastern District of Pennsylvania, a statement of all material evidence and information currently in its possession and of which it is the original source. These disclosure statements are supported by material evidence known to the Relators at the time of filing establishing the existence of Defendants' false claims. Because the statements include attorney-client communications and work product of Relators' attorneys, and were submitted to those Federal officials in their capacity as potential co-counsel in the litigation, Relators understand these disclosures to be confidential and exempt from disclosure under the Freedom of Information Act. 5 U.S.C. § 552; 31 U.S.C. § 3729(c).

## LEGAL BACKGROUND[2]

### *The False Claims Act*

17.     The False Claims Act provides, in pertinent part:

(a) Liability for Certain Acts.—

(1) In general.— Subject to paragraph (2), any person who—

> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

> (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

> (C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G);

> (D) has possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivers, or causes to be delivered, less than all of that money or property;

> (E) is authorized to make or deliver a document certifying receipt of property used, or to be used, by the Government and, intending to defraud

---

[2] In the interests of brevity, the relevant legal provisions concerning the violations of Plaintiff States' statutes are contained in the counts section below.

the Government, makes or delivers the receipt without completely knowing that the information on the receipt is true;

(F) knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the Government, or a member of the Armed Forces, who lawfully may not sell or pledge property; or

(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104–410), plus 3 times the amount of damages which the Government sustains because of the act of that person.

 (3) Costs of civil actions.— A person violating this subsection shall also be liable to the United States Government for the costs of a civil action brought to recover any such penalty or damages.

(b) Definitions.— For purposes of this section—

(1) the terms "knowing" and "knowingly"—

(A) mean that a person, with respect to information—

(i) has actual knowledge of the information;

(ii) acts in deliberate ignorance of the truth or falsity of the information; or

(iii) acts in reckless disregard of the truth or falsity of the information; and

(B) require no proof of specific intent to defraud;

(2) the term "claim"—

(A) means any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that—

(i) is presented to an officer, employee, or agent of the United States; or

(ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government—

(I) provides or has provided any portion of the money or property requested or demanded; or

(II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded; and

(B) does not include requests or demands for money or property that the Government has paid to an individual as compensation for Federal employment or as an income subsidy with no restrictions on that individual's use of the money or property;

(3) the term "obligation" means an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment; and

(4) the term "material" means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property.

18.     Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, 28 C.S.C. § 2461 (notes), and 28 C.F.R. § 85.1, False Claims Act civil penalties were increased from $5,000 to $11,000 for violations occurring on or after September 29, 1999.

<u>*The Anti-Kickback Statute*</u>

19.     The Anti-Kickback Statute  provides as follows, in pertinent part:

(b) Illegal remunerations

(1) Whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind—

(A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

(B) in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

(2) Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person—

(A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

(B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

### *The Social Security Act*

20.     The Social Security Act provides as follows, in pertinent part:

(a) Basic freedom of choice

Any individual entitled to insurance benefits under this subchapter may obtain health services from any institution, agency, or person qualified to participate under this subchapter if such institution, agency, or person undertakes to provide him such services.

## **FACTUAL BACKGROUND**

### I.    **Overview of Medicare and its Benefits**

21.     Generally, there are several types of mental health services available to Medicare eligible patients.  Those types of services fall into two basic areas: outpatient care and inpatient care.

9

### A.    Inpatient Care

22.    Medicare participants may receive psychiatric treatment on an inpatient basis, provided that the treatment can reasonably be expected to improve the patient's condition. A mental health physician such as a psychiatrist must provide a certification at the time of the patient's inpatient admission (or as soon thereafter as is reasonable and practicable) that the patient needs, on a daily basis, active inpatient treatment.  Re-certifications as to the ongoing need for inpatient care are also required—the first as of the 12th day of hospitalization and subsequent re-certifications at intervals established by the facility's utilization review committee, but no less than every 30 days.

23.    Medicare Part A (or Part B, if the patient has exhausted Part A benefits) covers inpatient psychiatric care where the above-requirements are met.  Patients may receive these services in a general hospital or a psychiatric hospital that only cares for people with mental health conditions.  Medicare patients treated for psychiatric conditions in inpatient facilities are covered for a maximum of 90 days of care per illness plus a lifetime bank of 60 additional days for stays exceeding 90 days.  This benefit is otherwise unlimited provided care is rendered in a general hospital.  However, Medicare patients are limited to 190 days of care in freestanding psychiatric hospitals, such as the Defendant Facilities discussed herein.  Medicare's current *per diem* base rate for inpatient care is $698, with the actual rates varying depending on the number of services provided to patient.  In 2011, Medicare spent approximately $4.3 billion on inpatient mental health services.

### B.    Outpatient Care

24.    Outpatient mental health services are traditionally provided out of a clinic or doctor's or therapist's office, but can be hospital-based, particularly where the patient is

receiving therapy through, for example, a PHP.

25.     PHP treatment is provided to patients that are psychiatrically acute, medically compromised and at-risk for relapsing and/or needing inpatient care compared to patients in more traditional and other outpatient-based therapies.  PHP services are typically a form of "step down" care from inpatient facilities, and are provided with the expectation that the patient's psychiatric condition and level of functioning will improve and that full re-hospitalization can be avoided.

26.     Medicare's reimbursement requirements for PHPs are more restrictive than those governing other types of outpatient care and inpatient mental health care.[3]  Medicare reimbursed PHPs are only available to patients with profound mental health conditions and only if certain admission criteria are met.  In order for a patient to participate in a PHP, a physician must certify that the patient would need inpatient treatment but for participation in the PHP.  These certifications must occur upon admission, at day 18 of treatment, and every 30 days thereafter.  Further, on admission, the physician must develop an individualized treatment plan for each patient including treatment goals and a specific description of the coordinated services to be provided.  Because PHPs are treatment and goal-oriented, patients who are not able to cognitively participate in PHP services (particularly dementia and Alzheimer's patients) or cannot reasonably be expected to benefit from PHP services cannot be admitted to a PHP.[4]

---

[3] Summarized here, the regulations governing PHPs are codified at 42 CFR § 4210.43 *et seq.* and 42 CFR § 424.24 *et seq.*  PHPs also are governed by 42 U.S.C. § 1395 *et seq.*

[4] PHPs are usually available for the treatment of alcoholism and substance abuse problems, anorexia and bulimia, depression, bipolar disorder, anxiety disorders, and other mental illnesses. In addition, there are PHP's geared specifically toward geriatric patients, adult patients, adolescents, or young children.

27.     PHPs can be located in hospitals or in standalone mental health centers. Regardless of the setting, PHPs must employ a multidisciplinary approach to treatment. That is, PHPs must provide a combination of individual, group, family, occupational and activity therapies. Programs comprised of diversionary activity, social activity or recreational therapy do not constitute PHPs. Moreover, PHP programs must be distinct from other outpatient programs, day treatment or psychosocial rehabilitation programs. Importantly, and as noted, above, PHP services must be provided under the direct supervision of a physician pursuant to an individualized treatment plan, and the services must be essential for treatment of the patient's condition.

28.     Patients continue to reside at home, but commute to the PHP up to seven days a week. Patients are required to physically attend their PHPs at least 20 hours per week. If they fail to do so, the PHP is unable to bill Medicare for any time spent or treatment rendered on the patient for that week. As such, PHPs have a strong financial incentive to ensure that a patient attends regularly. PHPs are reimbursed between $204.89 and $238.33 for PHP services per patient, per day, with the rates varying depending on the number of services provided to patient. Each year, Medicare spends over $290 million on PHP services.[5]

II.     **UHS's Fraudulent Scheme**

    A.     **False Claims Act Violations**

        1.     **Billing for Unnecessary Inpatient Services**

29.     Medicare requires that a patient must be a risk to him or herself or to others,

---

[5] CMS has stated that the "ideal" PHP length of stay is 2 to 3 weeks (approximately 16 sessions). *See Impacts Associated with the Medicare Psychiatric PPS: A Study of Partial Hospitalization Programs.* CMS Report, February 2009.

whether intentionally or as a result of impaired self-care, in order to be admitted to reimbursable inpatient psychiatric treatment.  As discussed herein, Defendants systematically disregarded this requirement, artificially extending Medicare patients' inpatient hospital stays and fabricating patients' needs for such services to justify unnecessary inpatient stays in an effort to increase Medicare reimbursement revenue.

a.   <u>**Artificially Driving Up and Extending Admissions**</u>

30.   According to Jane Doe, Bellaire's unwritten theme was to "max out Medicare," meaning: do whatever necessary to milk every Medicare dollar out of participants that presented for care.  To that end, Bellaire management, including Chief Executive Officers ("CEOs") Laurence Story and defendant Nekic and Bellaire's Chief Financial Officers ("CFOs") held and regularly attended a "Morning Meeting" every weekday.  Also in attendance were high-ranking Bellaire employees including Heidi Evans, Kevin Quiocho, and Cherrie Ramlal.

31.   Jane Doe attended approximately ten Morning Meetings in the absence of her supervisor, Admissions Director Chris Rodriguez ("Rodriguez"), a regular attendee.  The Morning Meetings, which lasted approximately 60 minutes with low level employees being allowed to leave once their portion concluded, took place across from the CEO and CFO offices on the first floor at approximately 10 o'clock and went as follows: first, Care Center (triage) personnel would present the prior day's admissions.  Next, all participants discussed a daily report run by either Rodriguez or Jane Doe that listed the patients by unit, their insurance information and the number of days left for which their insurance would pay.  These reports were the basis of Bellaire's "Projection System"—a quota based system used by Bellaire management that, by design, assumed all Medicare patients would stay for the maximum period for which Medicare would pay ***notwithstanding their actual condition and their yet unknown***

13

*progress*, and enabled management to prepare revenue forecasts, according to Fact Witness 1,[6] who worked as a discharge coordinator at Bellaire's inpatient facility and was thereby privy to the creation and purpose of the reports.  That the Company "assumed" that patients would stay for the maximum reimbursable period under Medicare is telling, and Defendants did everything they could to ensure that this result eventuated.

32.     For example, Bellaire's executives, including defendant Nekic, also used the reports to remain acutely aware of all discharges and would become particularly agitated when he perceived Bellaire's discharge rates as too high, according to Jane Roe.  For example, according to both Fact Witness 1 and Jane Roe when discharge rates reached approximately eight per day, Nekic would shout at the Morning Meeting participants "why are they leaving?" or "why is [patient name] leaving?" and regularly suggest that physicians "keep them here" (*i.e.,* reconsider a discharge recommendation) purportedly to "make sure they are stable" ***despite Nekic having no involvement in patient care***.[7]  Nekic (and Bellaire's CFO) would also instruct therapists to "find a way" to keep patients longer than their condition warranted and even trained them in strategies for doing so, according to Fact Witness 1.

33.     Jane Doe and Jane Roe each further recall that Bellaire management put even greater emphasis on pushing to expand and accept more patients once UHS took over.  Indeed, Jane Roe recalls reviewing emails from UHS representatives during this period regarding Bellaire's census and discussing how important it was to keep it above a certain percentage.

---

[6] Throughout the Complaint, Relators reference the statements of certain "Fact Witnesses" who, while they are not relators, have knowledge of the facts underlying the allegations herein.

[7] Nor should he.  Nekic possesses a Bachelor of Arts in Psychology from Cleveland State University and a Master of Business Administration from University of Phoenix, but, upon information and belief, has no known medical training.

34.     Fact Witness 5 served as a management-level employee at Bellaire and Kingwood between January 2009 and May 2011.  In conjunction with his employment, Fact Witness 5 had access to Bellaire's and Kingwood's internal documents, and participated in meetings and planning sessions, in which the culpable activities set forth herein were discussed and/or caused to be executed.  Fact Witness 5 also recalls Nekic behaving exactly as described by Fact Witness 1 and Jane Roe: he was obsessed with finding ways to prevent patient discharges.  Fact Witness 5 further recalls that Nekic's behavior and demands that staff find a way to "keep them here" was particularly hostile and common on Fridays, a day on which Bellaire's discharge to admit ratio is typically at its highest.

35.     Indeed, Bellaire patients were often bribed or mislead into longer inpatient stays and continuing outpatient care.  Defendant Nekic was part of most, if not all, of these shenanigans.  Fact Witness 2 recalls staff (including him) being paid to go out and buy patients whatever they wanted to keep them happy so that they would agree to stay longer.  And, as set forth below, physicians also participated in this and other Medicare rip-off schemes—Bellaire Inpatient Medical Director Dr. Ashok Jain ("Jain"), for example, placated patients by lying about their length of stay, telling patients, that he or she would only be at Bellaire a week or two, while expressly planning to prevent discharge until all Medicare money was used up for the stay, according to Fact Witness 1.  Dr. Jain also "bribed" patients to stay without protest by supplying them with "all the meds they want."[8]  Most of his patients stay between 30-90 days, according to Jane Roe.

---

[8] Although Fact Witness 5 did not work with Dr. Jain at Bellaire, he did work with him at another Houston-area mental health facility and recalls Dr. Jain making similar "deals" with patients.  Specifically, Dr. Jain would invite those patients to "tell me what [prescription] to write" in order to placate them during their artificially prolonged stays.

36.     According to Jane Roe, attending physicians had to obtain **non-clinician** defendant Nekic's permission to discharge their patients from Bellaire.  The overwhelming majority of Medicare patients whose discharge Nekic approved were pressured to remain Bellaire patients in whatever capacity possible, according to Fact Witness 5 and Jane Roe. Specifically, on discharge, Bellaire management including Nekic expected discharge planners to "make sure patients stay in the [Bellaire] system."  Nekic and other management including Evans instructed Jane Roe to pressure patients (especially Medicare patients) into staying in the Bellaire "system" by making transition easy, over-emphasizing the importance of "continuity of care" and promising an uninterrupted supply of medications (a constant worry for patients).

37.     Fact Witness 5 and documents corroborate Jane Roe in this regard.  According to Fact Witness 5, Defendants took and take steps to steer patients—particularly Medicare patients—to internal programs as a matter of policy.  For example, the Company's action plan for 2011 (the "2011 Action Plan") states "Business Office to obtain inpatient and outpatient benefits during all VOBs [Verification of Benefits]" and "Educate discharge planners to plan patients (sic) discharge to BHB [Behavioral Hospital of Bellaire] outpatient program to assure BHB continuum of care."[9]  In reality and practice, these action items were instructions to business office employees to identify and flag Medicare patients and discharge planners who, in turn, were to pressure those patients to continue care with Bellaire.[10]

38.     Pressuring patients to stay in Bellaire's care weighed heavily on Jane Roe because "numerous" patients would fight not to go to Bellaire PHPs, reporting that they do not receive

---

[9] A true and correct copy of the 2011 Action Plan is attached hereto as Exhibit A.

[10] Of note, patients with private insurance were not pressured to stay in the Bellaire system due to perceived greater oversight from those companies.

any treatment while there.[11]   Indeed, patients—for example, Cynthia L. and Reves A.[12]—reported a typical day as follows: group therapy followed by smoking, watching television and playing games.

39.    When efforts failed, and patients left the Bellaire "system" following discharge (*i.e.,* went to a competing PHP), Nekic would yell at Morning Meetings, demanding to know why the patient was no longer "ours."

40.    Those Medicare patients that were not directly pressured to remain Bellaire patients were discharged with a "wink and a nod" only to be readmitted once their Medicare "patient days" reset, according to Jane Roe.  Medicare does not cover inpatient stays exceeding 90 days per illness, so a patient staying beyond 90 days would be forced to dip into his or her lifetime supply of 60 Medicare "reserve" days or his or her own pocket, neither of which is an appealing option for a patient.  Knowing these and other limitations, facilitates often "work with" patients (*i.e.,* through discharge gaming) to navigate outside Medicare's rules.[13]

41.    Bellaire runs similar scams to drive up its PHP census.  Among its most successful is its 90 day admit/discharge scheme, which works as follows, according to Fact Witness 5:  Once a patient is admitted to the outpatient setting following an inpatient stay, the

---

[11] This pressure ultimately led Jane Roe to resign.

[12]  Patient last names omitted for confidentiality reasons.

[13] Facilities like Bellaire play discharge/readmit games with Medicare in an effort to maximize profits.  For example, reimbursement rates for inpatient psychiatric facilities is highest in the beginning of a patient's stay (to accommodate for initial testing and evaluations) and declines as the patient's stay continues.  Moreover, Medicare patients are obligated to pay a co-payment of $283 per day for days 61-90 of their impatient stays, which they typically cannot afford.  Moreover, all inpatient admissions should cost Medicare patients a deductible amount of $1,132.  According to Jane Doe, Bellaire does not charge all patients the deductible.

patient typically will stay up to and to 90 days.  This 90 day period represents an initial outpatient admission certification of 18 days (called the initial PHP certification) and subsequent second and third recertification period.  Once the patient approaches the end of the third re-certification period, the patient is "encouraged" by complicit PHP doctors and group home owners to allow a discharge from the PHP—Bellaire's work-around for the widespread belief in the PHP industry that Medicare will more closely scrutinize an admission that exceeds 90 days than those that do not.  Patients that agree to this discharge are allowed to remain in their group home during their non-treatment period under the implied condition that the patient will then seek readmission for "change of mental status" or some other issue following a period of 3-5 days.  Once that post-3-5 day change of mental status occurs, the patient is typically first admitted to the inpatient program and then admitted back into the PHP for step-down care. The group home owners/operators are incentivized to participate in such schemes, whether through direct kickbacks or simply in cost savings associated with not needing to supervise or feed residents during the day.  As such, complicit home owners/operators punish residents by changing or limiting the patient's food and/or comfort if the patients protest or do not agree to go along with the scheme.  Unfortunately, this scheme runs continuously, and some patients will go through the cycle for years if not a decade of perpetual admit and discharge to and from PHPs every 90 days.

> ### b.       Fabricating Illnesses to Justify Admissions of "Goldenrod" and "Frequent Flyer" Patients

42.     When, despite best efforts, Bellaire's patient numbers declined, Bellaire management would instruct Bellaire personnel to "cold call" Medicare recipients with the goal of admitting them to the inpatient facility.  According to Fact Witness 2, a receptionist and patient relations employee at Bellaire from September 2010 - October 2012, and Jane Roe, Bellaire

maintained a list of area Medicare and Medicaid patients—called the "Goldenrod"—and a stable of "frequent flyers," or patients with psychiatric histories that they could call and easily convince to self-admit or be admitted to the facility.  On the orders of defendant Nekic, Andre Bennett or Heidi Evans, employees such as Fact Witness 4 were instructed to call patients from the Goldenrod and entice them back to the facility.  According to Fact Witness 4, his superiors supplied him with scripts to provide to patients willing to return to Bellaire, such as "I'm hearing voices telling me to hurt someone."

43.     Marketers (and sometimes employees like Fact Witness 4) also would contact the "frequent flyers" and bring them in from their group homes, hospitals, outpatient programs or the streets to increase census without regard for the patients' actual need for inpatient care (*i.e.,* a threat to self or others), recalls Fact Witness 5.  So important was the "frequent flyer" program to Bellaire that marketers also had a script that they followed when contacting the patients (usually from an office on the first floor in Bellaire in the presence of Heidi Evans), according to Jane Roe.  Other employees were forced to make these calls, too.

44.     For example, Fact Witness 3 worked as a social worker/weekend intake specialist at Bellaire.  According to Fact Witness 3, she too had to make the calls on weekend, and she recalls the cold call script including questions like "how are you feeling?" and "would you like to come in and be evaluated?"  Patients who did come in (and had viable Medicare coverage or "days left") "would be admitted and would have to stay 'per the doctor' for about thirty days," according to Fact Witness 3.

45.     To keep the cycle going, Bellaire patients often were referred to group homes on discharge if they did not already have one.  Heidi Evans provided Jane Roe with a list of homes she was permitted to refer patients to in the area.   According to Jane Roe, the list was comprised

of homes that "would bring people to the PHPs."

46.     Jane Roe and Fact Witness 5, among others, believe that Defendants continue operating as above to this day.  Defendants' actions, namely the continuous provision of unnecessary treatment to Medicare recipients, constitutes fraud.

### 2.     Billing for Non-Medicare Compliant Outpatient Services

47.     Defendants have and continue to bill Medicare for PHP-related treatment that is either improperly rendered or not rendered at all.  As is detailed above, PHPs are required to provide patients with, among other things, continuous physician involvement; a highly structured, multidisciplinary approach to meaningful treatment involving multiple therapies; and an environment that includes only patients receiving the same level of care.  Despite the stringent standards and conditions set forth in the Medicare regulations, Defendant PHPs and their complicit doctors provide little or no care or treatment to the PHP patients.   Instead, PHP days are structured to keep patients reasonably "happy."  During the day, patients are given hours of free time to smoke and mill around.  They are shown movies to take up time.  Incentives such as cigarettes, medications and personal hygiene products are used to mollify patients.  Patients quickly learn that if they want their "meds," "smokes" and smoke breaks they better play along with the system.  For those patients who rock the boat, medications can be withheld, cigarettes and smoke time restricted, and other forms of punishment inflicted.

48.     Further, the complicit group home owners are notified and patient conformity is enforced.  Fact Witness 5 estimates that between 2008 and 2012, Kingwood Pine and Bellaire billed between $204.89 and $238.33 each day for hundreds of patients, each of whom got little or no services required.   The dollar value of this fraud, extrapolated over 4 years and all facilities amounts to hundreds of millions of dollars.   Indeed, upon information and belief,

similar conduct took place at multiple UHS facilities in Texas.

49.     Fact Witness 4 was a patient at Cypress's PHP for two months in the beginning of 2013.  According to Fact Witness 4 -- and contrary to federal requirements -- Cypress's PHP program "had no structure."  The four hour daily program consisted of one hour of self-reflection on paper and the remainder of the day in purported group therapy.  The group therapy, however, contained no therapeutic component – it actually consisted of looking around, walking around and socializing.  Fact Witness 4 recalls only one "structured" group activity, which therapists called "relaxation therapy" or "relaxation activity" and consisted of sitting quietly in a room with the lights out.  "Individual therapy" consisted of the same therapist purportedly monitoring the ongoing group therapy calling patients one at a time to the side of the group room for a superficial discussion.  Moreover, the Cypress PHP patients were mixed in with the Intensive Outpatient Program ("IOP") patients, a wholly distinct program with far less intense and strict medical (and Medicare) policies.

50.     Fact Witness 4's first-hand observations are consistent with those of Fact Witness 5, who states that patients were regularly admitted to Bellaire's PHP that did not meet federal criteria.  Bellaire physicians, primarily Drs. Fernando Torres and Riaz S. Mazcuri, admitted all patients that presented, typically assigning each a general and/or broad diagnosis such as major depression or schizoaffective disorder, and then would model their observations to comport with the DSM requirements for the selected condition.  Typically, Bellaire physicians would spend one day per week at a given PHP seeing all new patients and about one quarter of the existing patients (so that all would be seen by month's end) for very brief, generic and superficial consultations.  For example, Fact Witness 5 once witnessed Dr. Mazcuri purportedly "assess" 22 patients in 45 minutes.

51.     Fact Witness 5, likewise, never witnessed a physician participate in the design or implementation of the requisite patient treatment plan at Defendants' facilities.  Indeed, the only active involvement Fact Witness 5 observed from these physicians consistently was at discharge.  According to Fact Witness 5, patient discharges from PHPs required permission from management at the inpatient facility and the attending physician.  As such, PHP therapists would request the discharge of patients once they could not benefit from the PHP (meaning that the patient had plateaued or was never qualified in the first place).  The physicians—particularly the otherwise uninvolved Dr. Torres—regularly denied these discharge requests.  He would ignore a mental health therapist's finding that a particular patient could not further benefit from PHP services.  Instead, he would falsely and without any genuine basis indicate that a patient was in decline (rather than the intended statement from the therapist that the patient had progressed) and thus manufacture support for an inpatient admission (and higher billing) thus increasing patients' length of stays.  This was particularly prevalent at Cypress and Kingwood.

52.     Finally, Fact Witness 5 observed (on multiple occasions) Bellaire physicians, including Dr. Torres and Mazcuri, admit patients to Bellaire's PHP who medically could not benefit from PHP.  Specifically, Fact Witness 5 observed Drs. Torres and Mazcuri admit to Bellaire's PHP patients: Benjamin C., Mona W., Ernestine H., Margaret W., Donald J., Dara R., Bertha S., Charlotte S., Dale W. and Gladys W.  Each of these patients, however, had dementia or Alzheimer's disease and was thus precluded from participation in any PHP.

53.     Fact Witness 5 believes that Defendants continue operating as above.  Defendants' failure to provide Medicare-compliant therapy and its conscious decision to group the PHP and IOP patients and to treat patients who failed to meet criteria (such as those suffering from dementia and Alzheimer's Disease) rendered its billing to Medicare for PHP therapy

22

fraudulent.

54.     By implementing this scheme, Defendants have caused millions of dollars of false claims be submitted to the government under Medicare Part B from at least 2009 and up and through the present.   Upon information and belief, UHS has established, maintained and/or facilitated a similar policy across its behavioral health facilities.

**B.     <u>Anti-Kickback Statute Violations</u>**

55.     As noted, above, the federal Anti-Kickback Statute prohibits making or accepting payments to induce or reward referrals for federally-funded health care services except in limited, enumerated "safe harbor" situations.   With respect to Medicare reimbursed mental health services, the Anti-Kickback Statute prohibits anyone (including healthcare providers such doctors and PHP providers) from giving and receiving anything of value in order to induce or make patient referrals for mental health services.   Similarly, the Anti-Kickback Statute prohibits compensating physicians for unlawfully increasing admission rates and/or lengths of stays at mental health facilities.

56.     Here, Defendants and affiliated physicians routinely violated the Anti-Kickback Statute by unlawfully compensating and otherwise rewarding physicians who conspired with the Defendant Facilities to defraud Medicare by increasing revenue per patient by engaging in the following: (a) rubber stamping for admission to the Defendants' facilities all patients the physician "evaluates" regardless of whether those patients meet admission criteria and unnecessarily referring a high proportion of their patients to conspiring Defendants; and (b) artificially increasing patients' lengths of stays at Defendants' facilities.

**1.     <u>Physician Rewards for Increasing Patient Census</u>**

57.     Fact Witness 5 states that between January 2009 and May 2011, he participated in

multiple meetings at Bellaire during which he and other management-level employees[14] reviewed physicians' patient referral and admission (versus rejection) and recertification statistics and awarded the best performers with either a directorship or co-directorship title. Bellaire then paid the directors and co-directors at least $5,000 per month.

58.     In June 2013, Fact Witness 5 confirmed with former colleague/current Bellaire Outpatient Service Director George Grant ("Grant") that this practice continues unchanged at Bellaire.  Indeed, Grant stated that then present medical director Dr. Torres obtained his position and title based primarily on his willingness to certify for admission any and all patients into Bellaire's PHP regardless of whether they met admission criteria.[15]  Conversely, Bellaire management is (as of June 2013) actively trying to "drive out" another physician, Dr. Larry Flowers, who only admits qualified patients, according to Grant.[16]

59.     Similarly, Dr. Mazcuri, who was awarded directorship of Bellaire's Tomball facility based on a contractual arrangement (not a reward for prior performance) and served as such from approximately 2009-2011, had a 90-95% admission rate and had, on average, approximately 30 patients there at any given time.  However, he performed little, if any, "medical director" functions.  Instead, as a reward for his high referral and acceptance rate, he was allowed to (and did) send his nurse practitioner to do his initial evaluations and subsequent

---

[14] Includes Messers. Story, Nekic, Bennett and Grant.

[15] To put Dr. Torres's near 100% PHP admission rate in context, historically, only 50-60% of patients nationally are qualified and admitted to PHPs.

[16] In addition to the compensation and prestige, being a director gave the physician first choice of admitted patients—another coveted benefit because, as more fully discussed below, patients typically continue to treat with whoever serves as his or her attending physician at Bellaire long after discharge.

patient care.  On average, Dr. Mazcuri would go to the facility one time per week, and then just to sign off on all new admissions—*i.e.,* the patients already evaluated and admitted by his nurse practitioner—frequently backdating the admission paperwork to coincide with the actual admission date.

60.     Similarly, in an around 2010, while Fact Witness 5 was at Kingwood, Dr. Gary E. Miller, the facility's medical director sought to increase the inpatient and PHP patient censuses by attracting patients from the then underserved geriatric psychiatric or "geri-psych" population. To this end, Dr. Miller added 12 high-reimbursement geri/psych inpatient beds to Kingwood. Kingwood also added Dr. Manjeshwar R. Prabhu ("Prabhu") to Kingwood's staff.  Dr. Prabhu was and is well known in the Houston medical community for his ingenuity in increasing censuses and revenues for mental health facilities—that is, for inventing or exaggerating patient (mis)behavior in order to justify transferring elderly and infirm nursing home patients from local nursing homes and admitting them to psychiatric facilities when called upon to increase census at the PHP.  These patients were particularly vulnerable and were generally incapable of objecting to Dr. Prabhu's fabricated diagnosis of "change of mental status."  Consistent with his reputation at the time, when Kingwood's inpatient census was low, Dr. Prabhu would go to the nursing homes in which he had privileges such as Ashwood Gardens in North Houston in order to populate those unused beds.[17]   And, just as Dr. Torres was awarded a directorship at Bellaire based on his ability to fill beds improperly, so too was Dr. Prabhu awarded a directorship at Kingwood for his efforts.

---

[17] Of course not everyone appreciates Dr. Prabhu's actions.  On one instance, in 2008, the administrator of Ashwood Gardens called angrily because he found out four patients had been taken out of that facility on a Friday (thereby affecting that facility's census for the weekend) and put into Kingwood.

61.     But Dr. Prahbu was not the only person that engaged in this type of geri-psych patient "recruitment," nor was it only occurring at Kingwood.  In fact, driving up geri-psych and PHP patient census by any means necessary was openly discussed at Bellaire.  Specifically, at least between 2009 and 2011, Bellaire management held a weekly marketing meeting at the inpatient facility in the office of marketing director Andre Bennett.  Attendees included Fact Witness 5, Sharonda Holmes, Adrian (L/N/U), Chris (L/N/U) and Kevin Quiocho.  Bennett would lead the meetings.  During the meetings, participants would review inpatient and outpatient census numbers and divide up responsibilities with regard to driving up census.  For the most part, the meetings focused on the outpatient census because that was much more flexible than the inpatient census; the inpatient length of stay being much less variable than the outpatient stay because inpatient stays are supposed to be relatively short to stabilize a patient while an outpatient stay can be indefinite.  However, meeting participants also discussed Bellaire's daily report, which tracked an analyzed all discharges and pending admissions in an effort to keep patients in Bellaire facilities for all levels of "care."

## 2.     Physician Rewards for Increasing Patients' Lengths of Stays

62.     Drs. Gurdip S. Buttar, Ajinder S. Dhatt, and Jain[18] were/are particularly proficient at unlawfully increasing Bellaire's average inpatient length of stay ("LOS") at Bellaire.  As is the case with all inpatient facilities, patient discharges require a formal discharge order from the attending physician.  According to Fact Witness 5, patients generally did not seek discharge during the week, but as Friday approached many patients sought to be discharged and avoid

---

[18] Dr Buttar has offices at 6006 Bellaire Blvd, Houston, TX.  Dr. Dhatt has offices at 6260 Westpark Dr #100, Houston, TX.  Dr. Jain has offices at 5314 Dashwood Drive, Houston, TX 77081.  All are psychiatrists.

staying locked in the facility over the weekend.   Aware of this, Dr. Buttar and Dr. Dhatt were well known to limit their Friday rounds at the facility.  Many times these physicians would not show up or, if they did, would arrive very late in the day.[19]  When patients would complain, they were made "whole" by being given incentives such as cigarettes.[20]

63.    Other physicians—particularly current Bellaire Inpatient Medical Director Dr. Jain—placated patients by lying about their length of stay, telling them, for example, that he or she would only be at Bellaire a week or two, while expressly planning to prevent discharge until all Medicare money was used up for the stay, according to Fact Witness 1.  Dr. Jain also "bribed" patients to stay without protest by supplying them with "all the meds they want," according to Jane Roe.

64.    According to Fact Witness 5, physicians' efforts in this regard are guided by Bellaire's management and its stated goal of increasing revenues by extending patient LOS.  To this end, Bellaire's management held specific discussions about methods of incentivizing patients to stay Friday through the weekend.  And to track and reward physicians' participation in this endeavor, management monitored each of the complicit doctors' discharge trends and rewarded those with high LOS averages—such as Dr. Buttar and Dr. Dhatt (and later Dr. Jain)—with more patient assignments.[21]

65.    As mentioned above, patient assignments are of tremendous value to mental

---

[19] Dr. Prabhu was also engaged in this scheme.

[20] This is not to say that Dr. Dhatt or Dr. Buttar were more available to patients during the week. In fact, the regular order of affairs was that these doctors would come to the inpatient facility once, maybe twice a week.  Patients would be lined up in the hallways waiting for the doctors, who would see approximately 10 patients in an hour and a half.

[21] By way of contrast, Dr. Cordona, who previously had many patients assigned to him, did not play along with Bellaire's scheme.  As a result, he was given fewer patients.

health physicians, particularly crooked ones.  Once assigned a patient, the physician is able to bill for services provided in the inpatient facility, generating income.  Then, if the patient continues to be treated by the physician after discharge (which patients almost always do), the physician can bill for every patient encounter during the months or years the patient remains in treatment, again generating a revenue stream.  In addition, certain unscrupulous doctors (including Dr. Prahbu and Dr. Dhatt) further exploit their patients for money by making kickback for referral arrangements to group homes and/or referring patients to group homes in which they have a financial interest as Dr. Prahbu and Dr. Dhatt have done.  Specifically, these doctors refer patients almost exclusively to a group home widely believed to be owned, at least in part, by Drs. Buttar and Dhatt.  The group home in turn, almost exclusively, refers residents of the group home to Bellaire, which then assign the patients to Dr. Buttar or Dr. Dhatt.

        C.      **<u>Social Security Act Violations</u>**

66.     As discussed above, the Social Security Act provides, in pertinent part: Any individual entitled to insurance benefits under this subchapter may obtain health services from any institution, agency, or person qualified to participate under this subchapter if such institution, agency, or person undertakes to provide him such services.  *See* 42 U.S.C. 1395a.

67.     Defendants violated the Social Security Act because they unlawfully "steered" patients to Defendant-owned facilities.  Specifically, as discussed above, according to John Doe, pursuant to UHS's scheme, doctors at Bellaire were rewarded because patients are "steered" to that doctor for treatments.  Further, according to John Doe, these doctors then engage in systematic phantom visits and false billing with these patients.

68.     Additionally, as discussed above, the 2011 Action Plan referenced above states "Business Office to obtain inpatient and outpatient benefits during all VOBs [Verification of

Benefits]" and "Educate discharge planners to plan patients (sic) discharge to BHB [Behavioral Hospital of Bellaire] outpatient program to assure BHB continuum of care."

69.     Accordingly, it is clear that in addition to Defendants' rampant violations of the False Claims Act (and the Plaintiff States' equivalents) and the Anti-Kickback Statute, Defendants have likewise violated the Social Security Act.

**COUNT I**
**(False Claims Act 31 U.S.C. § 3729(a)(1)(A)**
**formerly 31 U.S.C. § 3729(a)(1))**

70.     Relators repeat each allegation in each of the proceeding paragraphs of this Complaint with the same force and effect as if set forth herein.

71.     Defendants submitted bills to Medicare for mental health related services that were unnecessary, not provided and/or not eligible for payment due to non-compliance with the relevant, codified treatment and/or billing requirements.

72.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented to an officer or employee of the United States false or fraudulent Medicare or Medicaid claims for payment or approval, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1), as amended by 31 U.S.C. § 3729(a)(1)(A).

73.     By reason of the foregoing, the United States has suffered actual damages and is entitle to recover treble damages plus a civil monetary penalty for each false claim.

**COUNT II**
**(False Claims Act 31 U.S.C. § 3729(a)(1)(B)**
**formerly 31 U.S.C. § 3729(a)(2))**

74.     Relators repeat each allegation in each of the proceeding paragraphs of this Complaint with the same force and effect as if set forth herein.

75.     Defendants submitted bills to Medicare for mental health related services that

were unnecessary, not provided and/or not eligible for payment due to non-compliance with the relevant, codified treatment and/or billing requirements.

76.     By virtue of the acts described above, Defendants knowingly made, used or caused to be made or used, false records or statements material to false or fraudulent Medicare or Medicaid claims, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(2), as amended by 31 U.S.C. § 3729(a)(1)(B).

77.     By reason of the foregoing, the United States has suffered actual damages and is entitle to recover treble damages plus a civil monetary penalty for each false claim.

## COUNT III
### (The Anti-Kickback Statute)

78.     Relators repeat each allegation in each of the proceeding paragraphs of this Complaint with the same force and effect as if set forth herein.

79.     As discussed herein, Defendants unlawfully compensated and otherwise rewarded physicians whom conspired with the Defendant Facilities to defraud Medicare by increasing revenue per patient by engaging in the following: A) Rubber stamping for admission to the Defendants' facilities all patients the physician "evaluates" regardless of whether those patients meet admission criteria and unnecessarily referring a high proportion of their patients to conspiring Defendants; and B) Artificially increasing patients' lengths of stays at Defendants' facilities.

80.     By virtue of the acts described above, Defendants knowingly violated the provisions of the Anti-Kickback Statute, 42 U.S.C. § 1320a et seq.

81.     By reason of the foregoing, the United States has suffered actual damages.

## COUNT IV
### (Social Security Act)

82.     Relators repeat each allegation in each of the proceeding paragraphs of this Complaint with the same force and effect as if set forth herein.

83.     As discussed herein, Defendants unlawfully "steered" patients to Defendant-owned facilities.

84.     By virtue of the acts described above, Defendants knowingly violated the provisions of the Social Security Act, 42 U.S.C. 1395a.

85.     By reason of the foregoing, the United States has suffered actual damages.

## COUNT V
### (Illinois Whistleblower Reward & Protection Act)

86.     Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

87.     This is a *qui tam* action brought by Relators on behalf of the State of Illinois to recover treble damages and civil penalties under the Illinois Whistleblower Reward and Protection Act, 740 ILCS 175 *et seq.*

88.     740 ILCS 175/3(a) provides liability for any person who:

(1)     knowingly presents, or causes to be presented, to an officer or employee of the State a false or fraudulent claim for payment or approval;

(2)     knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State;

(3)     conspires to defraud the State by getting a false or fraudulent claim allowed or paid.

89.     Defendants violated 740 ILCS 175/3(a) and knowingly caused false claims to be made, used and presented to the State of Illinois by its deliberate and systematic violation of federal and state laws by engaging in the conduct alleged herein and by virtue of the fact that

none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

90.     Specifically, Defendants submitted bills to the State of Illinois for mental health related services that were unnecessary, not provided and/or not eligible for payment due to non-compliance with the relevant, codified treatment and/or billing requirements.

91.     The State of Illinois, by and through the Illinois Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

92.     Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Illinois in connection with Defendants' conduct.   Compliance with applicable Illinois statutes and regulations was also an express condition of payment of claims submitted to the State of Illinois.

93.     Had the State of Illinois known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

94.     As a result of Defendants' violations of 740 ILCS 175/3(a), the State of Illinois has been damaged in an amount far in excess of millions of dollars exclusive of interest.

95.     Relators have direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to 740 ILCS 175/3(b) on behalf of themselves and the State of Illinois.

96.     This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Illinois in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants

To the STATE OF ILLINOIS:

(1)     Three times the amount of actual damages which the State of Illinois has sustained as a result of Defendants' conduct;

(2)     A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of Illinois;

(3)     Prejudgment interest; and

(4)     All costs incurred in bringing this action.

To Relators:

(1)     The maximum amount allowed pursuant to 740 ILCS 175/4(d) and/or any other applicable provision of law;

(2)     Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3)     An award of reasonable attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

## COUNT VI
## (California False Claims Act)

97.     Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

98.     This is a *qui tam* action brought by Relators on behalf of the State of California to recover treble damages and civil penalties under the California False Claims Act, Cal. Gov't. Code § 12650 *et seq.*

99.     Cal. Gov't Code § 12651(a) provides liability for any person who

(1)     knowingly presents, or causes to be presented, to an officer or employee of the state or of any political division thereof; a false claim for payment or approval;

(2)     knowingly makes, uses, or causes to be made or used a false record or statement to get a false claim paid or approved by the state or by any political subdivision;

(3)     conspires to defraud the state or any political subdivision by getting a false claim allowed or paid by the state or by any political subdivision;

(4)     is a beneficiary of an inadvertent submission of a false claim to the state or a political subdivision, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the state or the political subdivision within a reasonable time after discovery of the false claim.

100.    Defendants violated Cal. Gov't Code § 12651(a) and knowingly caused false claims to be made, used and presented to the State of California by engaging in the conduct alleged herein and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government funded healthcare programs.

101.    Specifically, Defendants submitted bills to the State of California for mental health related services that were unnecessary, not provided and/or not eligible for payment due to non-compliance with the relevant, codified treatment and/or billing requirements.

102.    The State of California, by and through the California Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

103.    Compliance with applicable Medicare, Medi-Cal and the various other federal and state laws cited herein was an implied, and upon information and belief; also an express condition of payment of claims submitted to the State of California in connection with Defendants' conduct. Compliance with applicable California statutes and regulations was also an express condition of payment of claims submitted to the State of California.

104.    Had the State of California known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

105.    As a result of Defendants' violations of Cal. Gov't Code § 12651(a), the State of California has been damaged in an amount far in excess of millions of dollars exclusive of interest.

106.    Relators have direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to Cal. Gov't Code § 12652(c) on behalf of themselves and the State of California.

107.    This Court is requested to accept supplemental jurisdiction over this related state claim as it is predicated upon the same exact facts as the federal claim, and merely asserts separate damages to the State of California in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

To the STATE OF CALIFORNIA:

(1)    Three times the amount of actual damages which the State of California has sustained as a result of Defendants' conduct;

(2)    A civil penalty of up to $10,000 for each false claim which Defendants presented or caused to be presented to the State of California;

(3)    Prejudgment interest; and

(4)    All costs incurred in bringing this action.

To Relators:

(1)     The maximum amount allowed pursuant to Cal. Gov't Code § 12652 and/or any other applicable provision of law;

(2)     Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3)     An award of reasonable attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

## COUNT VII
## (Florida False Claims Act)

108.     Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

109.     This is a *qui tam* action brought by Relators on behalf of the State of Florida to recover treble damages and civil penalties under the Florida False Claims Act, Fla. Stat. § 68.081 *et seq*.

110.     Fla. Stat. § 68.082(2) provides liability for any person who:

(a)     knowingly presents, or causes to be presented, to an officer or employee of an agency a false or fraudulent claim for payment or approval;

(b)     knowingly makes, uses, or causes to be made or used, a false record or statement to     get a false or fraudulent claim paid or approved by an agency;

(c)     conspires to submit a false claim to an agency or to deceive an agency for the purpose of getting a false or fraudulent claim allowed-or paid.

111.     Defendants further violated Fla. Stat. § 68.082(2) and knowingly caused false claims to be made, used and presented to the State of Florida by engaging in the conduct alleged herein and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

112.     Specifically, Defendants submitted bills to the State of Florida for mental health related services that were unnecessary, not provided and/or not eligible for payment due to non-

compliance with the relevant, codified treatment and/or billing requirements.

113.    The State of Florida, by and through the Florida Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

114.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Florida in connection with Defendants' conduct.   Compliance with applicable Florida statutes and regulations was also an express condition of payment of claims submitted to the State of Florida.

115.    Had the State of Florida known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

116.    As a result of Defendants' violations of Fla. Stat. § 68.082(2), the State of Florida has been damaged in an amount far in excess of millions of dollars exclusive of interest.

117.    Relators have direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to Fla. Stat. § 68.083(2) on behalf of themselves and the State of Florida.

118.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Florida in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages

to the following parties and against Defendants:

To the STATE OF FLORIDA:

(1) Three times the amount of actual damages which the State of Florida has sustained as a result of Defendants' conduct;

(2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of Florida;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To Relators:

(1) The maximum amount allowed pursuant to Fla. Stat. § 68.085 and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT VIII
## (Texas False Claims Act)

119.    Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

120.    This is a *qui tam* action brought by Relators on behalf of the State of Texas to recover double damages and civil penalties under V.T.C.A. Hum. Res. Code § 36.001 *et seq.*

121.    V.T.C.A. Hum. Res. Code § 36.002 provides liability for any person who –

(1) knowingly or intentionally makes or causes to be made a false statement or misrepresentation of a material fact:

(a) on an application for a contract, benefit, or payment under the Medicaid program; or

(b) that is intended to be used to determine its eligibility for a benefit or payment

under the Medicaid program

(2) knowingly or intentionally concealing or failing to disclose an event:

    (a) that the person knows affects the initial or continued right to a benefit or payment under the Medicaid program of:

        (i)     the person, or

        (ii)    another person on whose behalf the person has applied for a benefit or payment or is receiving a benefit or payment; and

    (b) to permit a person to receive a benefit or payment that is not authorized or that is greater than the payment or benefit that is authorized;

*** 

(4)  knowingly or intentionally makes, causes to be made, induces, or seeks to induce the making of a false statement or misrepresentation of material fact concerning:

***

    (b) information required to be provided by a federal or state law, rule, regulation, or provider agreement pertaining to the Medicaid program;

(5) knowingly or intentionally charges, solicits, accepts, or receives, in addition to an amount paid under the Medicaid program, a gift, money, a donation, or other consideration as a condition to the provision of a service or continued service to a Medicaid recipient if the cost of the service provided to the Medicaid recipient is paid for, in whole or in part, under the Medicaid program.

122.    Defendants violated V.T.C.A. Hum. Res. Code § 36.002 and knowingly caused false claims to be made, used and presented to the State of Texas by engaging in the conduct alleged herein and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

123.    Specifically, Defendants submitted bills to the State of Texas for mental health related services that were unnecessary, not provided and/or not eligible for payment due to non-compliance with the relevant, codified treatment and/or billing requirements.

124.    The State of Texas, by and through the Texas Medicaid program and other state

healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

125.     Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Texas in connection with Defendants' conduct.  Compliance with applicable Texas statutes and regulations was also an express condition of payment of claims submitted to the State of Texas.

126.     Had the State of Texas known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

127.     As a result of Defendants' violations of V.T.C.A. Hum. Res. Code § 36.002, the State of Texas has been damaged in an amount far in excess of millions of dollars exclusive of interest.

128.     Defendants did not, within 30 days after they first obtained information as to such violations, furnish such information to officials of the State responsible for investigating false claims violations, did not otherwise fully cooperate with any investigation of the violations, and has not otherwise furnished information to the State regarding the claims for reimbursement at issue.

129.     Relators have direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to V.T.C.A. Hum. Res. Code § 36.101 on behalf of themselves and the State of Texas.

130.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Texas in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

To the STATE OF TEXAS:

(1)    Two times the amount of actual damages which the State of Texas has sustained as a result of Defendants' conduct;

(2)    A civil penalty of not less than $10,000 pursuant to V.T.C.A. Hum. Res. Code § 36.025(a)(3) for each false claim which Defendants cause to be presented to the state of Texas;

(3)    Prejudgment interest; and

(4)    All costs incurred in bringing this action.

To Relators:

(1)    The maximum amount allowed pursuant to V.T.C.A. Hum. Res. Code § 36.110, and/or any other applicable provision of law;

(2)    Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3)    An award of reasonable attorneys' fees and costs; and

(4)    Such further relief as this Court deems equitable and just.

## COUNT IX
### (Massachusetts False Claims Act)

131.    Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

132.    This is a *qui tam* action brought by Relators on behalf of the Commonwealth of Massachusetts for treble damages and penalties under the Massachusetts False Claims Act, Mass.

Gen. Laws Ann. Chap. 12 § 5(A) *et seq.*

133.   Mass. Gen. Laws Ann. Chap. 12 § 5B provides liability for any person who-

(1) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(2) knowingly makes, uses, or causes to be made or used, a false record or statement to obtain payment or approval of a claim by the commonwealth or

(3) conspires to defraud the commonwealth or any political subdivision thereof through the allowance or payment of a fraudulent claim;

* * *

(9) is a beneficiary of an inadvertent submission of a false claim to the common wealth or political subdivision thereof, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the commonwealth or political subdivision within a reasonable time after discovery of the false claim.

134.   Defendants further violated Mass. Gen. Laws Ann. Chap. 12 § 5B and knowingly caused false claims to be made, used and presented to the Commonwealth of Massachusetts by the conduct alleged herein and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

135.   Specifically, Defendants submitted bills to the Commonwealth of Massachusetts for mental health related services that were unnecessary, not provided and/or not eligible for payment due to non-compliance with the relevant, codified treatment and/or billing requirements.

136.   The Commonwealth of Massachusetts, by and through the Massachusetts Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

137.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the Commonwealth of Massachusetts in connection with Defendants' conduct.  Compliance with applicable Massachusetts statutes and regulations was also an express condition of payment of claims submitted to the Commonwealth of Massachusetts.

138.    Had the Commonwealth of Massachusetts known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

139.    As a result of Defendants' violations of Mass. Gen. Laws Ann. Chap. 12 § 5B, the Commonwealth of Massachusetts has been damaged in an amount far in excess of millions of dollars exclusive of interest.

140.    Relators have direct and independent knowledge of the allegations in this Complaint, who have brought this action pursuant to Mass. Gen. Laws Ann. Chap. 12 § 5(c)(2) on behalf of themselves and the Commonwealth of Massachusetts.

141.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the Commonwealth of Massachusetts in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages

to the following parties and against Defendants:

To the Commonwealth OF MASSACHUSETTS:

<ol type="1">
<li>Three times the amount of actual damages which the Commonwealth of Massachusetts has sustained as a result of Defendants' conduct;</li>

<li>A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the Commonwealth of Massachusetts;</li>

<li>Prejudgment interest; and</li>

<li>All costs incurred in bringing this action.</li>
</ol>

To Relators:

<ol type="1">
<li>The maximum amount allowed pursuant to Mass. Gen. Laws Ann. Chap. 12, §5F and/or any other applicable provision of law;</li>

<li>Reimbursement for reasonable expenses which Relators incurred in connection with this action;</li>

<li>An award of reasonable attorneys' fees and costs; and</li>

<li>Such further relief as this Court deems equitable and just.</li>
</ol>

**COUNT X**
**(Tennessee False Claims Act)**

142.    Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

143.    This is a *qui tam* action brought by Relators on behalf of the State of Tennessee to recover treble damages and civil penalties under the Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-181 *et seq.*

144.    Section 71-5-182(a)(1) provides liability for any person who-

(A)  presents, or causes to be presented to the state, a claim for payment under the Medicaid program knowing such claim is false or fraudulent;

(B)  makes or uses, or causes to be made or used, a record or statement to get a false or fraudulent claim under the Medicaid program paid for or approved by the state knowing such record or statement is false;

(C) conspires to defraud the State by getting a claim allowed or paid under the Medicaid program knowing such claim is false or fraudulent.

145.    Defendants violated Tenn. Code Ann. § 71-5-1 82(a)(1) and knowingly caused false claims to be made, used and presented to the State of Tennessee by the conduct alleged herein and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

146.    Specifically, Defendants submitted bills to the State of Tennessee for mental health related services that were unnecessary, not provided and/or not eligible for payment due to non-compliance with the relevant, codified treatment and/or billing requirements.

147.    The State of Tennessee, by and through the Tennessee Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

148.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Tennessee in connection with Defendants' conduct.  Compliance with applicable Tennessee statutes and regulations was also an express condition of payment of claims submitted to the State of Tennessee.

149.    Had the State of Tennessee known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

150.    As a result of Defendants' violations of Tenn. Code Ann. § 71-5-182(a)(1), the State of Tennessee has been damaged in an amount far in excess of millions of dollars exclusive of interest.

151.    Relators have direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to Tenn. Code Ann. § 71-5-183(a)(1) on behalf of themselves and the State of Tennessee.

152.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Tennessee in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

To the STATE OF TENNESSEE:

(1)     Three times the amount of actual damages which the State of Tennessee has sustained as a result of Defendants' conduct;

(2)     A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of Tennessee;

(3)     Prejudgment interest; and

(4)     All costs incurred in bringing this action.

To Relators:

(1)     The maximum amount allowed pursuant to Tenn. Code Ann. § 71-5-183(c) and/or any other applicable provision of law;

(2)     Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3)     An award of reasonable attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

## COUNT XI
## (Nevada False Claims Act)

153.     Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

154.     This is a *qui tam* action brought by Relators on behalf of the State of Nevada to recover treble damages and civil penalties under the Nevada False Claims Act, N.R.S. § 357.010, *et. seq.*

155.     N.R.S. § 357.040(1) provides liability for any person who -

(a) knowingly presents or causes to be presented a false claim for payment or approval;

(b) knowingly makes or uses, or causes to be made or used, a false record or statement to obtain payment or approval of a false claim;

(c) conspires to defraud by obtaining allowance or payment of a false claim;

*** 

(h) is a beneficiary of an inadvertent submission of a false claim and, after discovering the falsity of the claim, fails to disclose the falsity to the state or political subdivision within a reasonable time.

156.     Defendants violated N.R.S. § 357.040(1) and knowingly false claims to be made, used and presented to the State of Nevada by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

157.     Specifically, Defendants submitted bills to the State of Nevada for mental health related services that were unnecessary, not provided and/or not eligible for payment due to non-compliance with the relevant, codified treatment and/or billing requirements.

158.     The State of Nevada, by and through the Nevada Medicaid program and other

state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

159.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Nevada in connection with Defendants' conduct.   Compliance with applicable Nevada statutes and regulations was also an express condition of payment of claims submitted to the State of Nevada.

160.    Had the State of Nevada known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

161.    As a result of Defendants' violations of N.R.S. § 357.040(1), the State of Nevada has been damaged in an amount far in excess of millions of dollars exclusive of interest.

162.    Relators have direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to N.R.S. § 357.080(1) on behalf of themselves and the State of Nevada.

163.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Nevada in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request that this Court award the following damages to the following parties and against Defendants:

To the STATE OF NEVADA:

(1)     Three times the amount of actual damages which the State of Nevada has sustained as a result of Defendants' conduct;

(2)     A civil penalty of not less than $2,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of Nevada;

(3)     Prejudgment interest; and

(4)     All costs incurred in bringing this action.

To Relators:

(1)     The maximum amount allowed pursuant to N.R.S. § 357.210 and/or any other applicable provision of law;

(2)     Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3)     An award of reasonable attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

## COUNT XII
### (Louisiana Medial Assistance Programs Integrity Law)

164.    Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

165.    This is a *qui tam* action brought by Relators on behalf of the State of Louisiana to recover treble damages and civil penalties under the Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. Ann. § 437.1 *et seq.*

166.    La. Rev. Stat. Ann. § 438.3 provides-

(A)  No person shall knowingly present or cause to be presented a false or fraudulent claim;

(B) No person shall knowingly engage in misrepresentation to obtain, or attempt to obtain, payment from medical assistance program funds;

> (C) No person shall conspire to defraud, or attempt to defraud, the medical assistance programs through misrepresentation or by obtaining, or attempting to obtain, payment for a false or fraudulent claim.

167.    Defendants further violated La. Rev. Stat. Ann. §438.3 and knowingly caused false claims to be made, used and presented to the State of Louisiana by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

168.    Specifically, Defendants submitted bills to the State of Louisiana for mental health related services that were unnecessary, not provided and/or not eligible for payment due to non-compliance with the relevant, codified treatment and/or billing requirements.

169.    The State of Louisiana, by and through the Louisiana Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

170.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Louisiana in connection with Defendants' conduct.  Compliance with applicable Louisiana statutes and regulations was also an express condition of payment of claims submitted to the State of Louisiana.

171.    Had the State of Louisiana known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

172.     As a result of Defendants' violations of La. Rev. Stat. Ann. § 438.3, the State of Louisiana has been damaged in an amount far in excess of millions of dollars exclusive of interest.

173.     Relators have direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to La. Rev. Stat. Ann. §439.1(A) on behalf of themselves and the State of Louisiana.

174.     This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Louisiana in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

To the STATE OF LOUISIANA:

(1)     Three times the amount of actual damages which the State of Louisiana has sustained as a result of Defendants' conduct;

(2)     A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of Louisiana;

(3)     Prejudgment interest; and

(4)     All costs incurred in bringing this action.

To Relators:

(1)     The maximum amount allowed pursuant to La. Rev. Stat. § 439.4(A) and/or any other applicable provision of law;

(2)     Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3)     An award of reasonable attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

**COUNT XIII**
**(Virginia Fraud Against Tax Payers Act)**

175.    Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

176.    This is a *qui tam* action brought by Relators on behalf of the Commonwealth of Virginia for treble damages and penalties under Virginia Fraud Against Tax Payers Act, §8.01-216.3a, which provides liability for any person who-

> (1) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>
> (2) knowingly makes, uses, or causes to be made or used, a false record or statement to obtain payment or approval of a claim by the commonwealth or
>
> (3) conspires to defraud the commonwealth or any political subdivision thereof through the allowance or payment of a fraudulent claim;
>
> * * *
>
> (9) is a beneficiary of an inadvertent submission of a false claim to the common wealth or political subdivision thereof, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the commonwealth or political subdivision within a reasonable time after discovery of the false claim.

177.    Defendants further violated Virginia's Fraud Against Tax Payers Act, § 8.01-216.3a, and knowingly caused false claims to be made, used and presented to the Commonwealth of Virginia by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

178.    Specifically, Defendants submitted bills to the Commonwealth of Virginia for mental health related services that were unnecessary, not provided and/or not eligible for

payment due to non-compliance with the relevant, codified treatment and/or billing requirements.

179.    The Commonwealth of Virginia, by and through the Virginia Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

180.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the Commonwealth of Virginia in connection with Defendants' conduct.  Compliance with applicable Virginia statutes and regulations was also an express condition of payment of claims submitted to the Commonwealth of Virginia.

181.    Had the Commonwealth of Virginia known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

182.    As a result of Defendants' violations of Virginia's Fraud Against Tax Payers Act, §8.01-216.3a, the Commonwealth of Virginia has been damaged in an amount far in excess of millions of dollars exclusive of interest.

183.    Relators have direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to Virginia's Fraud Against Tax Payers Act, §8.01-216.3, on behalf of themselves and the Commonwealth of Virginia.

184.    This Court is requested to accept supplemental jurisdiction of this related state

claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the Commonwealth of Virginia in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

To the COMMONWEALTH OF VIRGINIA:

(1)     Three times the amount of actual damages which the Commonwealth of Virginia has sustained as a result of Defendants' conduct;

(2)     A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the Commonwealth of Virginia;

(3)     Prejudgment interest; and

(4)     All costs incurred in bringing this action.

To Relators:

(1)     The maximum amount allowed pursuant to VA Code Ann. § 32.1-315 and/or any other applicable provision of law;

(2)     Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3)     An award of reasonable attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

## COUNT XIV
## (Michigan Medicaid False Claims Act)

185.     Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

186.     This is a *qui tam* action brought by Relators on behalf of the State of Michigan to recover treble damages and civil penalties under Michigan's Medicaid False Claims Act, Mich. Comp. Laws Ann. § 400.603 *et seq.*, which provides in pertinent part as follows:

Sec. 3. (1) A person shall not knowingly make or cause to be made a false statement or false representation of a material fact in an application for medicaid benefits;

(2) A person shall not knowingly make or cause to be made a false statement or false representation of a material fact for use in determining rights to a medicaid benefit ....

187.    Defendants violated Michigan law and knowingly caused false claims to be made, used and presented to the State of Michigan by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

188.    Specifically, Defendants submitted bills to the State of Michigan for mental health related services that were unnecessary, not provided and/or not eligible for payment due to non-compliance with the relevant, codified treatment and/or billing requirements.

189.    The State of Michigan, by and through the Michigan Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

190.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Michigan in connection with Defendants' conduct.  Compliance with applicable Michigan statutes and regulations was also an express condition of payment of claims submitted to the State of Michigan.

191.    Had the State of Michigan known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by

healthcare providers and third party payers in connection with that conduct.

192.    As a result of Defendants' violations of the Medicaid False Claims Act, the State of Michigan has been damaged in an amount far in excess of millions of dollars exclusive of interest.

193.    Relators have direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to the Medicaid False Claims Act on behalf of themselves and the State of Michigan.

194.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Michigan in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

To the STATE OF MICHIGAN:

(1)    Three times the amount of actual damages which the State of Michigan has sustained as a result of Defendants' conduct;

(2)    A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of Michigan;

(3)    Prejudgment interest; and

(4)    All costs incurred in bringing this action.

To Relators:

(1)    The maximum amount allowed pursuant to the Medicaid False Claims Act and/or any other applicable provision of law;

(2)    Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3)    An award of reasonable attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

## COUNT XV
### (New Mexico Medicaid False Claims Act)

195.    Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

196.    This is a *qui tam* action brought by Relators on behalf of the State of New Mexico to recover treble damages and civil penalties under the New Mexico Fraud Against Taxpayers Act, N.M. Stat. Ann. §§ 27-14-1 *et seq.*, which provides in pertinent part as follows:

A person shall not:

> (1)  knowingly present, or cause to be presented, to an employee, officer or agent of the state or to a contractor, grantee, or other recipient of state funds, a false or fraudulent claim for payment or approval;

> (2)  knowingly make or use, or cause to be made or used, a false, misleading or fraudulent record or statement to obtain or support the approval of or the payment on a false or fraudulent claim;

> (3)  conspire to defraud the state by obtaining approval or payment on a false or fraudulent claim ....

197.    Defendants violated N.M. Stat. Ann. §§ 27-14-1 *et seq.* and knowingly caused false claims to be made, used and presented to the State of New Mexico by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

198.    Specifically, Defendants submitted bills to the State of New Mexico for mental health related services that were unnecessary, not provided and/or not eligible for payment due to non-compliance with the relevant, codified treatment and/or billing requirements.

199.    The State of New Mexico, by and through the New Mexico Medicaid program

and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

200.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of New Mexico in connection with Defendants' conduct.  Compliance with applicable New Mexico statutes and regulations was also an express condition of payment of claims submitted to the State of New Mexico.

201.    Had the State of New Mexico known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

202.    As a result of Defendants' violations of N.M. Stat. Ann. §§ 27-14-1 *et seq.* the State of New Mexico has been damaged in an amount far in excess of millions of dollars exclusive of interest.

203.    Relators have direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to N.M. Stat. Ann. §§ 27-14-1 *et seq.* on behalf of themselves and the State of New Mexico.

204.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of New Mexico in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

To the STATE OF NEW MEXICO:

(1)     Three times the amount of actual damages which the State of New Mexico has sustained as a result of Defendants' conduct;

(2)     A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of New Mexico;

(3)     Prejudgment interest; and

(4)     All costs incurred in bringing this action.

To Relators:

(1)     The maximum amount allowed pursuant to N.M. Stat. Ann. §§ 27-14-1 *et seq.* and/or any other applicable provision of law;

(2)     Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3)     An award of reasonable attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

### COUNT XVI
### (Indiana False Claims and Whistleblower Protection Act)

205.    Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

206.    This is a *qui tam* action brought by Relators on behalf of the State of Indiana to recover treble damages and civil penalties under the Indiana False Claims and Whistleblower Protection Act, Indiana Code 5-11-5.5 *et seq.*, which imposes liability on:

(b) A person who knowingly or intentionally:

(1) presents a false claim to the state for payment or approval;

(2) makes or uses a false record or statement to obtain payment or approval of a false claim from the state;

(3) with intent to defraud the state, delivers less money or property to the

state than the amount recorded on the certificate or receipt the person receives from the state;

(4) with intent to defraud the state, authorizes issuance of a receipt without knowing that the information on the receipt is true;

(5) receives public property as a pledge of an obligation on a debt from an employee who is not lawfully authorized to sell or pledge the property;

(6) makes or uses a false record or statement to avoid an obligation to pay or transmit property to the state;

(7) conspires with another person to perform an act described in subdivisions (1) through (6); or

(8) causes or induces another person to perform an act described in subdivisions (1) through (6) ....

207.     Defendants violated Indiana's False Claims Act and knowingly caused false claims to be made, used and presented to the State of Indiana by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

208.     Specifically, Defendants submitted bills to the State of Indiana for mental health related services that were unnecessary, not provided and/or not eligible for payment due to non-compliance with the relevant, codified treatment and/or billing requirements.

209.     The State of Indiana, by and through the Indiana Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

210.     Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Indiana in connection with Defendants'

conduct.   Compliance with applicable Indiana statutes and regulations was also an express condition of payment of claims submitted to the State of Indiana.

211.   Had the State of Indiana known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

212.   As a result of Defendants' violations of Indiana's False Claims Act, the State of Indiana has been damaged in an amount far in excess of millions of dollars exclusive of interest.

213.   Relators have direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to Indiana Code § 5-11-5.5 *et seq.* on behalf of themselves and the State of Indiana.

214.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Indiana in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

To the STATE OF INDIANA:

(1)   Three times the amount of actual damages which the State of Indiana has sustained as a result of Defendants' conduct;

(2)   A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of Indiana;

(3)   Prejudgment interest; and

(4)   All costs incurred in bringing this action.

To Relators:

    (1)    The maximum amount allowed pursuant to Indiana Code § 5-11-5.5 *et seq.* and/or any other applicable provision of law;

    (2)    Reimbursement for reasonable expenses which Relators incurred in connection with this action;

    (3)    An award of reasonable attorneys' fees and costs; and

    (4)    Such further relief as this Court deems equitable and just.

## COUNT XVII
## (Connecticut False Claims Act)

215.    Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

216.    This is a *qui tam* action brought by Relators on behalf of the State of Connecticut to recover treble damages and civil penalties under the Connecticut False Claims Act, Conn. Gen. Stat. § 17b-301a, *et seq.*

217.    Conn. Gen. Stat. § 17b-301b imposes liability as follows:

(a) No person shall:

(1) Knowingly present, or cause to be presented, to an officer or employee of the state a false or fraudulent claim for payment or approval under a medical assistance program administered by the Department of Social Services;

(2) Knowingly make, use or cause to be made or used, a false record or statement to secure the payment or approval by the state of a false or fraudulent claim under a medical assistance program administered by the Department of Social Services;

(3) Conspire to defraud the state by securing the allowance or payment of a false or fraudulent claim under a medical assistance program administered by the Department of Social Services;

(4) Having possession, custody or control of property or money used, or to be used, by the state relative to a medical assistance program administered by the Department of Social Services, and

intending to defraud the state or wilfully to conceal the property, deliver or cause to be delivered less property than the amount for which the person receives a certificate or receipt;

(5) Being authorized to make or deliver a document certifying receipt of property used, or to be used, by the state relative to a medical assistance program administered by the Department of Social Services and intending to defraud the state, make or deliver such document without completely knowing that the information on the document is true;

(6) Knowingly buy, or receive as a pledge of an obligation or debt, public property from an officer or employee of the state relative to a medical assistance program administered by the Department of Social Services, who lawfully may not sell or pledge the property; or

(7) Knowingly make, use or cause to be made or used, a false record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the state under a medical assistance program administered by the Department of Social Services.

218.    Defendants violated the Connecticut False Claims Act and knowingly caused false claims to be made, used and presented to the State of Connecticut by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

219.    Specifically, Defendants submitted bills to the State of Connecticut for mental health related services that were unnecessary, not provided and/or not eligible for payment due to non-compliance with the relevant, codified treatment and/or billing requirements.

220.    The State of Connecticut, by and through the Connecticut Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

221.    Compliance with applicable Medicare, Medicaid and the various other federal and

state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Connecticut in connection with Defendants' conduct.  Compliance with applicable Connecticut statutes and regulations was also an express condition of payment of claims submitted to the State of Connecticut.

222.   Had the State of Connecticut known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

223.   As a result of Defendants' violations of the Connecticut False Claims Act, the State of Connecticut has been damaged in an amount far in excess of millions of dollars exclusive of interest.

224.   Relators have direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to the Connecticut False Claims Act on behalf of themselves and the State of Connecticut.

225.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Connecticut in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

To the STATE OF CONNECTICUT:

(1)   Three times the amount of actual damages which the State of Connecticut has sustained as a result of Defendants' conduct;

(2)   A civil penalty of not less than $5,000 and not more than $10,000 for each

false claim which Defendants caused to be presented to the State of Connecticut;

(3)    Prejudgment interest; and

(4)    All costs incurred in bringing this action.

To Relators:

(1)    The maximum amount allowed pursuant to Connecticut False Claims Act, Conn. Gen. Stat. § 17b-301a *et seq.* and/or any other applicable provision of law;

(2)    Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3)    An award of reasonable attorneys' fees and costs; and

(4)    Such further relief as this Court deems equitable and just.

### COUNT XVIII
### (Georgia False Medicaid Claims Act)

226.    Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

227.    This is a *qui tam* action brought by Relators on behalf of the State of Georgia to recover treble damages and civil penalties under the Georgia False Medicaid Claims Act, Ga. Code Ann., § 49-4-168 *et seq.*

228.    The Georgia False Medicaid Claims Act imposes liability on any person who:

(1) Knowingly presents or causes to be presented to the Georgia Medicaid program a false or fraudulent claim for payment or approval;

(2) Knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the Georgia Medicaid program;

(3) Conspires to defraud the Georgia Medicaid program by getting a false or fraudulent claim allowed or paid;

(4) Has possession, custody, or control of property or money used or to be

used by the Georgia Medicaid program and, intending to defraud the Georgia Medicaid program or willfully to conceal the property, delivers, or causes to be delivered, less property than the amount for which the person receives a certificate of receipt;

(5) Being authorized to make or deliver a document certifying receipt of property used, or to be used, by the Georgia Medicaid program and, intending to defraud the Georgia Medicaid program, makes or delivers the receipt without completely knowing that the information on the receipt is true;

(6) Knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the Georgia Medicaid program who lawfully may not sell or pledge the property; or

(7) Knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay, repay, or transmit money or property to the State of Georgia ....

229.    Defendants violated the Georgia False Medicaid Claims Act and knowingly caused false claims to be made, used and presented to the State of Georgia by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

230.    Specifically, Defendants submitted bills to the State of Georgia for mental health related services that were unnecessary, not provided and/or not eligible for payment due to non-compliance with the relevant, codified treatment and/or billing requirements.

231.    The State of Georgia, by and through the Georgia Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

232.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Georgia in connection with Defendants'

conduct.   Compliance with applicable Georgia statutes and regulations was also an express condition of payment of claims submitted to the State of Georgia.

233.   Had the State of Georgia known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

234.   As a result of Defendants' violations of the Georgia False Medicaid Claims Act, the State of Georgia has been damaged in an amount far in excess of millions of dollars exclusive of interest.

235.   Relators have direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to the Georgia False Medicaid Claims Act on behalf of themselves and the State of Georgia.

236.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Georgia in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

To the STATE OF GEORGIA:

(1)   Three times the amount of actual damages which the State of Georgia has sustained as a result of Defendants' conduct;

(2)   A civil penalty of not less than $5,000 and not more than $11,000 for each false claim which Defendants caused to be presented to the State of Georgia;

(3)   Prejudgment interest; and

(4)     All costs incurred in bringing this action.

To Relators:

(1)     The maximum amount allowed pursuant to Georgia False Medicaid Claims Act, Ga. Code Ann., § 49-4-168, and/or any other applicable provision of law;

(2)     Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3)     An award of reasonable attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

## COUNT XIX
## (Minnesota False Claims Act)

237.    Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

238.    This is a *qui tam* action brought by Relators on behalf of the State of Minnesota to recover treble damages and civil penalties under the Minnesota False Claims Act, M.S.A. § 15C.01, *et seq.*

239.    Minnesota False Claims Act, M.S.A. § 15C.02, provides for liability for any person who:

(1) knowingly presents, or causes to be presented, to an officer or employee of the state or a political subdivision a false or fraudulent claim for payment or approval;

(2) knowingly makes or uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state or a political subdivision;

(3) knowingly conspires to either present a false or fraudulent claim to the state or a political subdivision for payment or approval or makes, uses, or causes to be made or used a false record or statement to obtain payment or approval of a false or fraudulent claim;

(4) has possession, custody, or control of public property or money used,

68

or to be used, by the state or a political subdivision and knowingly delivers
or causes to be delivered to the state or a political subdivision less money
or property than the amount for which the person receives a receipt;

(5) is authorized to prepare or deliver a receipt for money or property
used, or to be used, by the state or a political subdivision and knowingly
prepares or delivers a receipt that falsely represents the money or property;

(6) knowingly buys, or receives as a pledge of an obligation or debt,
public property from an officer or employee of the state or a political
subdivision who lawfully may not sell or pledge the property; or

(7) knowingly makes or uses, or causes to be made or used, a false record
or statement to conceal, avoid, or decrease an obligation to pay or transmit
money or property to the state or a political subdivision.

240.    Defendants violated the Minnesota False Claims Act and knowingly caused false
claims to be made, used and presented to the State of Minnesota by its deliberate and systematic
violation of federal and state laws and by virtue of the fact that none of the claims submitted in
connection with its conduct were even eligible for reimbursement by the government-funded
healthcare programs.

241.    Specifically, Defendants submitted bills to the State of Minnesota for mental
health related services that were unnecessary, not provided and/or not eligible for payment due to
non-compliance with the relevant, codified treatment and/or billing requirements.

242.    The State of Minnesota, by and through the Minnesota Medicaid program and
other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted
by healthcare providers and third party payers in connection therewith.

243.    Compliance with applicable Medicare, Medicaid and the various other federal and
state laws cited herein was an implied, and upon information and belief, also an express
condition of payment of claims submitted to the State of Minnesota in connection with
Defendants' conduct.  Compliance with applicable Minnesota statutes and regulations was also

an express condition of payment of claims submitted to the State of Minnesota.

244.    Had the State of Minnesota known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

245.    As a result of Defendants' violations of the Minnesota False Claims Act, the State of Minnesota has been damaged in an amount far in excess of millions of dollars exclusive of interest.

246.    Relators have direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to the Minnesota False Claims Act on behalf of themselves and the State of Minnesota.

247.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Minnesota in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

To the STATE OF MINNESOTA:

    (1)    Three times the amount of actual damages which the State of Minnesota has sustained as a result of Defendants' conduct;

    (2)    A civil penalty of not less than $5,000 and not more than $11,000 for each false claim which Defendants caused to be presented to the State of Minnesota;

    (3)    Prejudgment interest; and

    (4)    All costs incurred in bringing this action.

To Relators:

    (1)    The maximum amount allowed pursuant to Minnesota False Claims Act and/or any other applicable provision of law;

    (2)    Reimbursement for reasonable expenses which Relators incurred in connection with this action;

    (3)    An award of reasonable attorneys' fees and costs; and

    (4)    Such further relief as this Court deems equitable and just.

## COUNT XX
## (New Jersey False Claims Act)

248.    Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

249.    This is a *qui tam* action brought by Relators on behalf of the State of New Jersey to recover treble damages and civil penalties under the New Jersey False Claims Act, N.J.S.A. § 2A:32C-1, *et seq.*

250.    New Jersey False Claims Act, N.J.S.A. § 2A:32C-3, provides for liability for any person who:

a. Knowingly presents or causes to be presented to an employee, officer or agent of the State, or to any contractor, grantee, or other recipient of State funds, a false or fraudulent claim for payment or approval;

b. Knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the State;

c. Conspires to defraud the State by getting a false or fraudulent claim allowed or paid by the State;

d. Has possession, custody, or control of public property or money used or to be used by the State and knowingly delivers or causes to be delivered less property than the amount for which the person receives a certificate or receipt;

e. Is authorized to make or deliver a document certifying receipt of

property used or to be used by the State and, intending to defraud the entity, makes or delivers a receipt without completely knowing that the information on the receipt is true;

f. Knowingly buys, or receives as a pledge of an obligation or debt, public property from any person who lawfully may not sell or pledge the property; or

g. Knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the State.

251.    Defendants violated the New Jersey False Claims Act and knowingly caused false claims to be made, used and presented to the State of New Jersey by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

252.    Specifically, Defendants submitted bills to the State of New Jersey for mental health related services that were unnecessary, not provided and/or not eligible for payment due to non-compliance with the relevant, codified treatment and/or billing requirements.

253.    The State of New Jersey, by and through the New Jersey Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

254.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of New Jersey in connection with Defendants' conduct.  Compliance with applicable New Jersey statutes and regulations was also an express condition of payment of claims submitted to the State of New Jersey.

255.    Had the State of New Jersey known that Defendants were violating the federal

and state laws cited herein and/or that the claims submitted in connection with Defendants'
conduct failed to meet the reimbursement criteria of the government-funded healthcare programs
or were premised on false and/or misleading information, it would not have paid the claims
submitted by healthcare providers and third party payers in connection with that conduct.

256.    As a result of Defendants' violations of the New Jersey False Claims Act, the
State of New Jersey has been damaged in an amount far in excess of millions of dollars exclusive
of interest.

257.    Relators have direct and independent knowledge of the allegations of this
Complaint, who have brought this action pursuant to the New Jersey False Claims Act on behalf
of themselves and the State of New Jersey.

258.    This Court is requested to accept supplemental jurisdiction of this related state
claim as it is predicated upon the exact same facts as the federal claim, and merely asserts
separate damage to the State of New Jersey in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages
to the following parties and against Defendants:

To the STATE OF NEW JERSEY:

(1)    Three times the amount of actual damages which the State of New Jersey
has sustained as a result of Defendants' conduct;

(2)    A civil penalty of not less than $5,000 and not more than $11,000 for each
false claim which Defendants caused to be presented to the State of New
Jersey;

(3)    Prejudgment interest; and

(4)    All costs incurred in bringing this action.

To Relators:

(1)    The maximum amount allowed pursuant to New Jersey False Claims Act

and/or any other applicable provision of law;

(2)      Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3)      An award of reasonable attorneys' fees and costs; and

(4)      Such further relief as this Court deems equitable and just.

## COUNT XXI
## (North Carolina False Claims Act)

259.    Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

260.    This is a *qui tam* action brought by Relators on behalf of the State of North Carolina to recover treble damages and civil penalties under the North Carolina False Claims Act, N.C.G.S.A. § 1-605, *et seq.*

261.    North Carolina's False Claims Act, N.C.G.S.A. § 1-607, provides for liability for any person who:

(1) Knowingly presents or causes to be presented a false or fraudulent claim for payment or approval.

(2) Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim.

(3) Conspires to commit a violation of subdivision (1), (2), (4), (5), (6), or (7) of this section.

(4) Has possession, custody, or control of property or money used or to be used by the State and knowingly delivers or causes to be delivered less than all of that money or property.

(5) Is authorized to make or deliver a document certifying receipt of property used or to be used by the State and, intending to defraud the State, makes or delivers the receipt without completely knowing that the information on the receipt is true.

(6) Knowingly buys, or receives as a pledge of an obligation or debt, public property from any officer or employee of the State who lawfully

may not sell or pledge the property.

(7) Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the State, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the State.

262.    Defendants violated the North Carolina False Claims Act, and knowingly caused false claims to be made, used and presented to the State of North Carolina by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

263.    Specifically, Defendants submitted bills to the State of North Carolina for mental health related services that were unnecessary, not provided and/or not eligible for payment due to non-compliance with the relevant, codified treatment and/or billing requirements.

264.    The State of North Carolina, by and through the North Carolina Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

265.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of North Carolina in connection with Defendants' conduct.  Compliance with applicable North Carolina statutes and regulations was also an express condition of payment of claims submitted to the State of North Carolina.

266.    Had the State of North Carolina known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims

submitted by healthcare providers and third party payers in connection with that conduct.

267.   As a result of Defendants' violations of the North Carolina False Claims Act, the State of North Carolina has been damaged in an amount far in excess of millions of dollars exclusive of interest.

268.   Relators have direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to the North Carolina False Claims Act on behalf of themselves and the State of North Carolina.

269.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of North Carolina in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

To the STATE OF NORTH CAROLINA:

(1)   Three times the amount of actual damages which the State of North Carolina has sustained as a result of Defendants' conduct;

(2)   A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendants caused to be presented to the State of North Carolina;

(3)   Prejudgment interest; and

(4)   All costs incurred in bringing this action.

To Relators:

(1)   The maximum amount allowed pursuant to North Carolina False Claims Act and/or any other applicable provision of law;

(2)   Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3)   An award of reasonable attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

## COUNT XXII
## (Oklahoma Medicaid False Claims Act)

270.    Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

271.    This is a *qui tam* action brought by Relators on behalf of the State of Oklahoma to recover treble damages and civil penalties under the Oklahoma Medicaid False Claims Act, 63 Okl. St. Ann. § 5053, *et seq.*

272.    Oklahoma's Medicaid False Claims Act, 63 Okl. St. Ann. § 5053.1, provides for liability for any person who:

> 1. Knowingly presents, or causes to be presented, to an officer or employee of the State of Oklahoma, a false or fraudulent claim for payment or approval;
>
> 2. Knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state;
>
> 3. Conspires to defraud the State by getting a false or fraudulent claim allowed or paid;
>
> 4. Has possession, custody, or control of property or money used, or to be used, by the state and, intending to defraud the State or willfully to conceal the property, delivers, or causes to be delivered, less property than the amount for which the person receives a certificate or receipt;
>
> 5. Is authorized to make or deliver a document certifying receipt of property used, or to be used, by the State and, intending to defraud the State, makes or delivers the receipt without completely knowing that the information on the receipt is true;
>
> 6. Knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the state, who lawfully may not sell or pledge the property; or
>
> 7. Knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit

money or property to the State.

273.   Defendants violated the Oklahoma Medicaid False Claims Act and knowingly caused false claims to be made, used and presented to the State of Oklahoma by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

274.   Specifically, Defendants submitted bills to the State of Oklahoma for mental health related services that were unnecessary, not provided and/or not eligible for payment due to non-compliance with the relevant, codified treatment and/or billing requirements.

275.   The State of Oklahoma, by and through the Oklahoma Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

276.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Oklahoma in connection with Defendants' conduct.  Compliance with applicable Oklahoma statutes and regulations was also an express condition of payment of claims submitted to the State of Oklahoma.

277.   Had the State of Oklahoma known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

278.   As a result of Defendants' violations of the Oklahoma Medicaid False Claims

Act, the State of Oklahoma has been damaged in an amount far in excess of millions of dollars exclusive of interest.

279.    Relators have direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to the Oklahoma Medicaid False Claims Act on behalf of themselves and the State of Oklahoma.

280.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Oklahoma in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

To the STATE OF OKLAHOMA:

(1)    Three times the amount of actual damages which the State of Oklahoma has sustained as a result of Defendants' conduct;

(2)    A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of Oklahoma;

(3)    Prejudgment interest; and

(4)    All costs incurred in bringing this action.

To Relators:

(1)    The maximum amount allowed pursuant to Oklahoma Medicaid False Claims Act and/or any other applicable provision of law;

(2)    Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3)    An award of reasonable attorneys' fees and costs; and

(4)    Such further relief as this Court deems equitable and just.

**COUNT XXIII**

**(Colorado Medicaid False Claims Act)**

281.   Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

282.   This is a *qui tam* action brought by Relators on behalf of the State of Colorado to recover treble damages and civil penalties under the Colorado Medicaid False Claims Act, C.R.S.A. § 25.5-4-304, *et seq.*

283.   Colorado's Medicaid False Claims Act, C.R.S.A. § 25.5-4-304, provides for liability for any person who:

> (a) Knowingly presents, or causes to be presented, to an officer or employee of the state a false or fraudulent claim for payment or approval;
>
> (b) Knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim;
>
> (c) Has possession, custody, or control of property or money used, or to be used, by the state in connection with the "Colorado Medical Assistance Act" and knowingly delivers, or causes to be delivered, less than all of the money or property;
>
> (d) Authorizes the making or delivery of a document certifying receipt of property used, or to be used, by the state in connection with the "Colorado Medical Assistance Act" and, intending to defraud the state, makes or delivers the receipt without completely knowing that the information on the receipt is true;
>
> (e) Knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the state in connection with the "Colorado Medical Assistance Act" who lawfully may not sell or pledge the property;
>
> (f) Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state in connection with the "Colorado Medical Assistance Act", or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state in connection with the "Colorado Medical Assistance Act"; ...
>
> (g) Conspires to commit a violation of paragraphs (a) to (f) of this

subsection (1).

284.    Defendants further violated the Colorado Medicaid False Claims Act and knowingly caused false claims to be made, used and presented to the State of Colorado by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

285.    Specifically, Defendants submitted bills to the State of Colorado for mental health related services that were unnecessary, not provided and/or not eligible for payment due to non-compliance with the relevant, codified treatment and/or billing requirements.

286.    The State of Colorado, by and through the Colorado Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

287.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Colorado in connection with Defendants' conduct. Compliance with applicable Colorado statutes and regulations was also an express condition of payment of claims submitted to the State of Colorado.

288.    Had the State of Colorado known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

289.    As a result of Defendants' violations of the Colorado Medicaid False Claims Act,

the State of Colorado has been damaged in an amount far in excess of millions of dollars exclusive of interest.

290.     Relators have direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to the Colorado Medicaid False Claims Act on behalf of themselves and the State of Colorado.

291.     This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Colorado in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

To the STATE OF COLORADO:

(1)     Three times the amount of actual damages which the State of Colorado has sustained as a result of Defendants' conduct;

(2)     A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of Colorado;

(3)     Prejudgment interest; and

(4)     All costs incurred in bringing this action.

To Relators:

(1)     The maximum amount allowed pursuant to Colorado Medicaid False Claims Act and/or any other applicable provision of law;

(2)     Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3)     An award of reasonable attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

**COUNT XXIV**

### (Washington Medicaid Fraud Act)

292.    Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

293.    This is a *qui tam* action brought by Relators on behalf of the State of Washington to recover treble damages and civil penalties under the Washington Medicaid Fraud Act, RCWA 74.66.005, et seq.

294.    RCWA 74.66.020 in pertinent part provides for liability for any person who:

> (a) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>
> (b) Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;
>
> (c) Conspires to commit one or more of the violations in this subsection (1).

295.    Defendants furthermore violated the Washington Medicaid Fraud Act, RCWA 74.66.005, et seq., and knowingly caused false claims to be made, used and presented to the State of Washington by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

296.    Specifically, Defendants submitted bills to the State of Washington for mental health related services that were unnecessary, not provided and/or not eligible for payment due to non-compliance with the relevant, codified treatment and/or billing requirements.

297.    The State of Washington, by and through the Washington Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

298.    Compliance with applicable Medicare, Medicaid and the various other federal and

state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Washington in connection with Defendants' conduct. Compliance with applicable Washington statutes and regulations was also an express condition of payment of claims submitted to the State of Washington.

299.    Had the State of Washington known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

300.    As a result of Defendants' violations of the Washington Medicaid Fraud Act, RCWA 74.66.005, et seq., the State of Washington has been damaged in an amount far in excess of millions of dollars exclusive of interest.

301.    Relators have direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to the Washington Medicaid Fraud Act, RCWA 74.66.005, et seq. on behalf of themselves and the State of Washington.

302.    This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Washington in the operation of its Medicaid program.

WHEREFORE, Relators respectfully requests this Court to award the following damages to the following parties and against Defendants:

To the STATE OF WASHINGTON:

(1)    Three times the amount of actual damages which the State of Washington has sustained as a result of Defendants' conduct;

(2)    A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendants caused to be presented to the State of Washington;

(3)    Prejudgment interest; and

(4)    All costs incurred in bringing this action.

To Relators:

(1)    The maximum amount allowed pursuant to Washington Medicaid Fraud Act, RCWA 74.66.005, et seq. and/or any other applicable provision of law;

(2)    Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3)    An award of reasonable attorneys' fees and costs; and

(4)    Such further relief as this Court deems equitable and just.

## COUNT XXV
## (Delaware False Claims and Reporting Act)

303.    Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

304.    This is a *qui tam* action brought by Relators on behalf of the State of Delaware to recover treble damages and civil penalties under the Delaware False Claims and Reporting Act, Del. Code. Ann. Tit. 6 § 1201, et seq.

305.    Del. Code. Ann. Tit. 6 § 1201, in pertinent part, provides for liability for any person who:

(1) Knowingly presents, or causes to be presented to an officer or employee of the Government a false or fraudulent claim for payment or approval;

(2) Knowingly makes, uses or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the Government;

(3) Conspires to defraud the Government by getting a false or fraudulent claim allowed or paid;

\*\*\*

> (7) Knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government.

306.    Defendants further violated the Delaware False Claims and Reporting Act, Del. Code. Ann. Tit. 6 § 1201, et seq., and knowingly caused false claims to be made, used and presented to the State of Delaware by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

307.    Specifically, Defendants submitted bills to the State of Delaware for mental health related services that were unnecessary, not provided and/or not eligible for payment due to non-compliance with the relevant, codified treatment and/or billing requirements.

308.    The State of Delaware, by and through the Delaware Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

309.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Delaware in connection with Defendants' conduct. Compliance with applicable Delaware statutes and regulations was also an express condition of payment of claims submitted to the State of Delaware.

310.    Had the State of Delaware known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by

healthcare providers and third party payers in connection with that conduct.

311.    As a result of Defendants' violations of the Delaware False Claims and Reporting Act, Del. Code. Ann. Tit. 6 § 1201, et seq., the State of Delaware has been damaged in an amount far in excess of millions of dollars exclusive of interest.

312.    Relators have direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to the Delaware False Claims and Reporting Act, Del. Code. Ann. Tit. 6 § 1201, et seq. on behalf of themselves and the State of Delaware.

313.    This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Delaware in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

To the STATE OF DELAWARE:

    (1)    Not less than three times the amount of actual damages which the State of Delaware has sustained as a result of Defendants' conduct;

    (2)    A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendants caused to be presented to the State of Delaware;

    (3)    Prejudgment interest; and

    (4)    All costs incurred in bringing this action.

To Relators:

    (1)    The maximum amount allowed pursuant to the Delaware False Claims and Reporting Act, Del. Code. Ann. Tit. 6 § 1201, et seq. and/or any other applicable provision of law;

    (2)    Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3)     An award of reasonable attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

## COUNT XXVI
### (Hawaii False Claims Act)

314.    Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

315.    This is a *qui tam* action brought by Relators on behalf of the State of Hawaii to recover treble damages and civil penalties under the Hawaii False Claims Act, HAW. REV. STAT. §§ 661-21, et seq.

316.    HAW. REV. STAT. §§ 661-21, in pertinent part, provides for liability for any person who:

> (1) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>
> (2) Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;
>
> ***
>
> (7) Is a beneficiary of an inadvertent submission of a false claim to the State, who subsequently discovers the falsity of the claim, and fails to disclose the false claim to the State within a reasonable time after discovery of the false claim.

317.    Defendants further violated the Hawaii False Claims Act, HAW. REV. STAT. §§ 661-21, et seq., and knowingly caused false claims to be made, used and presented to the State of Hawaii by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

318.    Specifically, Defendants submitted bills to the State of Hawaii for mental health related services that were unnecessary, not provided and/or not eligible for payment due to non-

compliance with the relevant, codified treatment and/or billing requirements.

319.    The State of Hawaii, by and through the Hawaii Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

320.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Hawaii in connection with Defendants' conduct. Compliance with applicable Hawaii statutes and regulations was also an express condition of payment of claims submitted to the State of Hawaii.

321.    Had the State of Hawaii known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

322.    As a result of Defendants' violations of the Hawaii False Claims Act, HAW. REV. STAT. §§ 661-21, et seq., the State of Hawaii has been damaged in an amount far in excess of millions of dollars exclusive of interest.

323.    Relators have direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to the Hawaii False Claims Act, HAW. REV. STAT. §§ 661-21, et seq. on behalf of themselves and the State of Hawaii.

324.    This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Hawaii in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

To the STATE OF HAWAII:

(1)    Not less than three times the amount of actual damages which the State of Hawaii has sustained as a result of Defendants' conduct;

(2)    A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendants caused to be presented to the State of Hawaii;

(3)    Prejudgment interest; and

(4)    All costs incurred in bringing this action.

To Relators:

(1)    The maximum amount allowed pursuant to the Hawaii False Claims Act, HAW. REV. STAT. §§ 661-21, et seq. and/or any other applicable provision of law;

(2)    Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3)    An award of reasonable attorneys' fees and costs; and

(4)    Such further relief as this Court deems equitable and just.

## JURY TRIAL DEMANDED

325.    Relators demand a jury trial.

## PRAYER FOR RELIEF

WHEREFORE, Relators pray that the Court enter judgment against Defendants as follows:

(a) that the United States be awarded damages in the amount of three times the damages sustained by the United States because of the false claims alleged within this Complaint, as the Federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.*/provides;

(b) that civil penalties of $11,000 be imposed for each and every false claim that Defendants caused to be presented to the United States and/or its grantees, and for each false record or statement that Defendants made, used, or caused to be made or used that was material to a false or fraudulent claim;

(c) that attorneys' fees, costs, and expenses that Relators necessarily incurred in bringing and pressing this case be awarded;

(d) that Relators be awarded the maximum amount allowed to them pursuant to the False Claims Act; and

(e) that this Court such other and further relief as it deems proper.

DATED: February 12, 2014          Respectfully submitted,

**THE WEISER LAW FIRM, P.C.**

Robert B. Weiser (PA #81575)
Christopher L. Nelson (PA #85609)
Jeffrey J. Ciarlanto (PA #205838)
James M. Ficaro (PA #308198)
22 Cassatt Avenue
Berwyn, PA 19312
Telephone: (610) 225-2677

*Attorneys for Relators*

**JOSEPH TRAUTWEIN & ASSOCIATES, LLC**

Joseph Trautwein
17 Auchy Road
Erdenheim, Pennsylvania  19038
(215) 764-2301
jtrautwein@cpmiteam.com

*Attorneys for Relators*